EICHEL et al. v. MARCIN et al.

(District Court, S. D. New York.  April 2, 1913.)

1. COPYRIGHTS ⬤�longdash39—EXTENT OF MONOPOLY—PLAY.

A copyright does not give a monopoly in any incident in the play, but protects only the arrangements of the words, and permits other authors to exploit the general ideas, provided they do not substantially cover the form in which they have been developed, since the object of copyright is to promote science and the useful arts, and permitting the copyright to withdraw the ideas or conceptions of the copyrighted article from the stock of materials to be used by other authors would narrow the field of thought open for development.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 39.]

2. COPYRIGHTS ⬤⟍65—INFRINGEMENT—INCIDENT OF PLOT.

In a suit to restrain the infringement of the copyright of a dramatic play, defendants' play held not to copy from plaintiffs' play any plot, scene, dialogue, or characters, aside from general features of the plot, which were clearly open to common use.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 62.]

3. COPYRIGHTS ⬤⟍85—PRELIMINARY INJUNCTION—INFRINGEMENT OF · COPYRIGHT.

A preliminary injunction should not be granted for the infringement of a copyright after months of delay, where it appears that defendants did not know of the existence of plaintiffs' work until the commencement of the suit.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 78.]

In Equity.  Suit by Charles Gerard Eichel and another against Max Marcin and others for the infringement of a copyright.  On motion for injunction pendente lite.  Motion denied.

Ruskay & Ruskay, of New York City, for plaintiffs.

Nathan Burkan, of New York City, for defendants.

MANTON, District Judge.  The defendant Max Marcin claims to be the author of a play registered for copyright called "Cheating Cheaters."  The defendant Woods produced the play on the 9th of August, 1916, at the Eltinge Theater, New York City, where it has been playing since.  The Eltinge Theater is controlled by the A. H. Woods Theater Company.  Woods is the president and general manager of the Cheating Cheaters Company.

The plaintiffs claim they are the sole and exclusive proprietors and owners of a satirical melodramatic farce or play entitled "Wedding Presents," written and composed by them jointly, that it has never been published or produced in this or any foreign country, and that it was copyrighted under the copyright law of the United States under the title of "Wedding Presents" on the 18th of December, 1915.  The latter part of January, 1916, the plaintiffs submitted a copy of this play entitled "Wedding Presents" to the defendant Woods, by leaving a copy thereof at his office, the Eltinge Theater, with a Mr. Hoffenstein, then connected in business with said defendant.  This dramatic composition was returned to the plaintiffs about two months later.  The

inference sought to be drawn, and the claim by the plaintiffs, is that the title of this composition was changed to "Cheating Cheaters," and the play has been stolen, in violation of the plaintiffs' copyright, and the defendants should be restrained from producing it longer. The bill of complaint asks for the usual relief of damages in addition to an injunction.

Marcin, a playwright by profession, has produced such well-known plays as "The House of Glass" and "See My Lawyer." Prior thereto he was a reporter and author, and had written several novels and a number of short stories, which have been published in current magazines. He declares that his previous stories were so-called detective stories and were built upon detective plots. "Cheating Cheaters" is a crook play, with a woman detective as the leading figure. It has had a full season's run, and has proven very successful dramatically and financially, and therefore has had the approval of the theater-going public. Marcin swears the first act and part of the second were written as early as January, 1915, and in the month of January, 1915, he read to the defendant Woods the part written at that time and outlined the balance of the proposed play. It pleased Woods, and he then agreed to finish the production, which he did in April, 1916. He explains his delay in the production of the finished manuscript, stating that he was engaged in preparing the plays "The House of Glass" and "See My Lawyer." He denies any knowledge of the manuscript "Wedding Presents," and the story therein told, until the present action was instituted. Woods makes substantially the same claim. The affidavit of Woods' representative, Mr. Hoffenstein, denies the use of the play "Wedding Presents," and, indeed, deposes that he never as much as finished its reading. Briefly stated, the story of "Wedding Presents" is as follows:

The main idea is based upon the skillful attempt of Jack Barnes, the son of a police commissioner, who, in order to win the girl with whom he is in love and the consent of his father to the match, undertakes to apprehend a notorious band of thieves known as the "Wedding Present Trio." After a honeymoon, a young couple return to their home and employ a maid called Marie. She is in fact Jack Barnes. The wedding presents are displayed, a notorious gang known as the "Wedding Present Trio," much sought by the police, makes entry into the apartment by means of an aeroplane, landing on the front balcony of the house; this through permission obtained from the superintendent of the building. Marie assumes the identity of "Chicago Nell," a notorious crook, and with the butler, Dennison, find themselves in this home. The famous Dunne jewels and the wedding presents become the object of their plans. Other characters, Second Story Smith, Frenchy, the aviator, and Frisco Kate, the bogus Lady Dunne, are introduced. These crooks, fearing the proximity of the police, endeavor to take immediate action. Barnes, the detective, disguised as Marie, secures this employment, feeling that the "Wedding Present Trio" will be attracted to the Dunne household by newspaper reports of the arrival of the famous Dunne jewels and the wedding presents. A robbery of the house is planned at midnight. Carlo arranges to have Barnes accepted as the new maid in the Dunne household. Frisco Kate, one of the "Wedding Present Trio" disguised as Lady Dunne, bringing imitation jewels, asks for a safe place, and in that way secures the combination of the wall safe, in which the jewels are placed with the jewels of the newly weds.

Dennison informs Marie, who he thinks is Chicago Nell, of the appearance of the crooks, and Marie is caught by bogus Commissioner Barnes tampering

with the safe. She agrees to assist him in securing these jewels and participate with him in the robbery at midnight. Marie, in reality being Jack Barnes, the detective, has penetrated the disguise of Frisco Kate, or the bogus Lady Dunne, and constantly thwarts her as she wanders about. At midnight, the time planned for the robbery, bogus Commissioner Barnes learns of the duplicity of Henri, who is not on hand to aid him, and resolves to force Marie to assist in opening the safe. Marie tries to do so, but her plans are frustrated. Bogus Commissioner Barnes, or Second Story Smith, realizing the need for immediate action, arouses all the crooks and arranges for a clean get-away. To carry out his plan, he promises to arrest Henri, Dennison, and Marie, and, playing the part of the real Police Commissioner, he places the other members of the Dunne household about the room supposedly armed. Frisco Kate suddenly appears, and, finding the imitation jewels from the safe, claims that she has been robbed, when the real Lady Dunne appears on the scene bringing with her the real Dunne jewels. Bogus Commissioner Barnes, or Second Story Smith, takes possession of the jewels, and Marie, who has now succeeded in getting all the crooks together, exposes the bogus Lady Dunne as Frisco Kate, and charges her with having tried to double-cross the others. Bogus Commissioner Barnes, now confident, and believing that he has successfully secured the jewels, is about to leave, when the real Commissioner Barnes enters. Second Story Smith now stands revealed as the leader of the "Wedding Present Trio," and suggests that all the crooks make a get-away with a clean million in booty. Marie, who now suddenly turns upon him, covers him and the rest of the crooks, and after freeing the police commissioner's hands, they having been tied, turns the "Trio" over to him as prisoners. Marie is now revealed, not as a maid, but as Jack Barnes, son of the commissioner, who has successfully rounded up all the crooks without a struggle.

The story of "Cheating Cheaters," for the purpose of comparison, may be stated as follows:

Ruth Ferris, a young newspaper woman, who has displayed considerable skill in the investigation of news items concerning the doings of criminals, is offered a position at $75 a week by one of the burglary insurance companies. She accepts, and displays exceptional skill as an investigator, so much so that she resolves to go in the business for herself. The Ferris Detective Agency is established, and she has as her principal customers various burglary insurance companies which she has organized into a Mutual Protective Association. Ira Lazarre, a lawyer, has appeared for many years with suspicious regularity as counsel for the more prosperous members of the underworld. The authorities have entertained the belief that Lazarre has not only acted as counsel for the criminals, but has participated in their crimes to the extent of being an adviser and backer. Ruth Ferris determines to apprehend Lazarre, and enters into an arrangement with the district attorney whereby she is arrested as a shoplifter and lodged in the Tombs. She employs Lazarre, and he succeeds in gaining her acquittal before a jury. She easily convinces the lawyer that she is a highly gifted crook, and he places her with a company of high-class jewel thieves, known as the "Brockton gang." The Brocktons are located in an expensive suburban home, not owned by them, but rented and furnished. They masquerade as persons of eminent respectability, and are accepted as such by respectable neighbors, the Palmer family. The Brocktons are waiting to dispose of some stolen jewels. The unsuspected Ruth Ferris lives among them as Nan Brockton. George Brockton, head of the gang, finally decides to dispose of the stones in Europe, and takes Nan Brockton (Ruth Ferris) along on the trip. She poses as his daughter. Just as they arrive on the other side, the war breaks out and obviously it is useless to endeavor to market the jewels under such circumstances. They return to America, and on the boat Ruth meets Tom Palmer. They discover that they are neighbors, and, moreover, it is discovered by an exchange of confidences that the other is in possession of valuable jewels. On the second day of the return trip, the ship strikes a mine, Palmer's heroism results in saving the

lives of many, including Ruth and George Brockton. Ruth, first impressed with Tom's heroic conduct, admires him, and then grows to love him. Tom falls in love with her. In this state of bliss, the Palmers and Brockton's become neighbors in a suburb of New York.' Brockton and the Brockton gang, realizing that their future perpetration of crimes will become more difficult and dangerous, resolve to make one last big capture, and that the Palmer jewels. Ruth allows herself to be used as the apparent decoy to ensnare Tom Palmer, and through him enable the gang to steal the Palmer collection. The Palmers are invited to tea at the Brocktons' home. A frame-up is then arranged, so that the Brockton gang may go into the Palmer home. The Palmers arrive while Ruth is taking a music lesson from an Italian instructor named Verdi, alias Tony the Wop. They are told that Ruth is to play at the professor's concert and show great interest in it. Suddenly Brockton received a telegram. This is a false message, calling him and Mrs. Brockton to Chicago. It is stated that Ruth will have to accompany them, as it would be improper to allow her to remain in the house alone with the butler. Great distress is displayed, as this will prevent her playing at the concert of the Italian professor. This disappointment, however, is overcome by the acceptance of the Palmers' invitation to become their guest and remain at their home during her father's absence. She takes up her abode with the Palmers, and, while there, it is arranged that the Italian professor visit her. The departure of the Palmers is followed by a celebration on the part of the Brocktons, who now see the Palmer jewels within their grasp. So sure are they of capturing the gems that Ruth instructs them in advance to scatter to South America, where the proceeds of the theft are to be marketed. She ends her instructions to the gang with the remark: "Well, boys, it looks like a good day's work for us."

The second act is laid in the Palmer home. Ruth learns the location of the safe and the jewels therein, and the combination of the wall safe, which is electrically protected. This information she passes to her confederates, and it is then decided to rob the house at midnight. Tom Palmer renews his avowal of love to Ruth and asks her to become his wife. At this time she rejects him. Other members of the Palmer family, entering the room, interrupt this love scene. Ruth goes to her room to dress for dinner. In the ensuing scene, it is revealed that the Palmers are likewise a gang of crooks, and, just as the Brocktons have been planning to get the Palmer jewels, so the Palmers have been planning to get the Brockton valuables. The Palmers consider that they are certain of obtaining the Brockton jewels, and Tom instructs his gang in advance to scatter to South America, where they will dispose of the jewels. His instructions end with the same remark: "Well, boys, it looks like a good day's work for us."

In the third act. Tom Palmer and one of his gang enter the Brockton house under the belief that the other members of the household are out of the city. Unexpectedly they are at home. Tom is captured in the act of rifling a lamp in which the Brockton jewels are secreted. For the first time the Brocktons realize that their respectable friends are jewel thieves, and they pretend the deepest indignation of this violation of their home. Tom and his confederates are securely tied and locked in separate rooms, while the Brockton gang leave the house to cross over to the Palmer house for the purpose of an easy robbery. The curtain drops. At the rise of the curtain Ruth enters. She has with her the Palmer jewels, which she has taken from the safe. She finds Tom and his confederates, but still pretends ignorance of their real character. Tom confesses that he is a crook, and pleads to be allowed to escape. The Brockton gang return. They are highly indignant and angry, because they have broken into the Palmer home only to find the safe empty. They accuse Ruth of having double-crossed them, but are elated on learning that Ruth has all the Palmer jewels. Tom Palmer now realizes for the first time that Ruth and the Brocktons are likewise crooks. He proposes that the two gangs consolidate and form a syndicate, pooling their loot and acting in concert thereafter. While they are seated about a table, discussing ways and means, the doors and windows are suddenly smashed in and a company of detectives from the Ferris Agency appear and apprehend both

gangs. The leader of the detectives, elated at the number of prisoners and the value of the booty scattered on the table, turns to his companions with the remark: "Well, boys, it looks like a good day's work for us."

The fourth act is in the office of the Ferris Detective Agency. Here all the prisoners appear. Lazarre, who has also been arrested, tries to show a way to beat the case, but their hopes fade when Ruth reveals herself as Ruth Ferris. Her love for Tom is real, and for his sake she has arranged for the capture of both gangs, under circumstances that enable her to dispose of them as she sees fit. She points out that all their lives they have been preying on society, and she intends now to compel them to enter her agency and help protect society. Faced by the alternative of 20 years in jail, all the crooks reluctantly write their confessions and agree to her terms.

In "Wedding Presents" the hero is Jack Barnes, son of the police commissioner. Because of the supposed failure of his father to be able to apprehend the Wedding Present Trio, and in order to save his father's position, he volunteers to run down the Wedding Present Trio and feels that by this service in the end his father's objection to his marriage to the girl he loves will disappear. He disguises himself as a woman and comes in contact with the crooks as a bogus housemaid.

In "Cheating Cheaters," two gangs of crooks endeavor to rob each other of certain famous jewels, which each gang has stolen at previous periods. A female detective named Ferris, posing as a member of one of these gangs, eventually arrests both, and recaptures all of the stolen jewels for their legitimate owners. Ferris falls in love with one of the thieves, and he falls in love with her. Because of this love, the woman detective saves the thief, and turns his companions and all the crooks into useful members of society as detectives.

The scene in "Wedding Presents" is an apartment house in New York in all three acts, while that in "Cheating Cheaters" is in a mansion in one of the suburbs of New York. The second act is in a neighboring mansion five miles distant, and the fourth act is in the office of a detective agency. The characters, fifteen in number in "Wedding Presents," and thirteen in "Cheating Cheaters," are not similar in point of motive, make-up, or dialogue. In "Cheating Cheaters" there are two gangs of crooks, and, while it might be said there are two gangs of crooks in "Wedding Presents," I do not think there is a similarity of characters, as claimed by the plaintiffs. The landing on the balcony of the eleventh floor of a Riverside apartment in an aeroplane and its subsequent flight across the Hudson river is far-fetched. It is impossible that such a machine could come and go from the 3x8-foot balcony.

[1] The object of copyright is to promote science and the useful arts. If an author, by originating a new arrangement and form of expression of certain ideas or conceptions, could withdraw these ideas or conceptions from the stock of materials to be used by other authors, each copyright would narrow the field of thought open for development and exploitation, and science, poetry, narrative, and dramatic fiction and other branches of literature would be hindered by copyright, instead of being promoted. A poem consists of words, expressing conceptions of words or lines of thoughts; but copyright in the poem gives no monopoly in the separate words, or in the ideas, conception, or facts expressed or described by the words. A copy-

right extends only to the arrangement of the words. A copyright does not give a monopoly in any incident in a play. Other authors have a right to exploit the facts, experiences, field of thought, and general ideas, provided they do not substantially copy a concrete form, in which the circumstances and ideas have been developed, arranged, and put into shape. Holmes v. Hurst, 174 U. S. 82, 19 Sup. Ct. 606, 43 L. Ed. 904.

[2] The plaintiffs have prepared a chart, in which they point out the similarities in the two plays, and they claim that their composition may be called a "crook play," in which two bands of crooks are trying to cheat each other, and that the subjects of their cheating are some famous jewels; further, that both plays deal with thieves masquerading as respectable citizens, detectives, and robbery planned and carried out as an inside job, and then that the big surprise is that the leading crook is in reality a detective, and then, of course, a love affair.

But the idea of showing a band of thieves in action is as old as the idea of a man impersonating a female for the purpose of detecting a crime. This was well exploited in "The Crinoline Girl." The court has been furnished with the manuscript of this play. In "The Crinoline Girl" Tom Hale hears of a $25,000 reward for the recovery of a necklace and other jewelry stolen by a gang of thieves who specialize in fancy dress balls as the theater of their prey. When the lights are put out, the thieves lift the jewels from the guests, a woman confederate then drops them out of the window to a waiting partner, robing herself anew in dress smuggled into the house for that purpose. Hale, in discovering the thieves at a ball, overpowers this female character, assumes her disguise, and finally succeeds, through this disguise, in capturing the thieves and turning them over to the authorities.

The subject of stealing wedding presents was pretty well exploited in "Stop Thief," which was played in New York in 1912. On the eve of the wedding of a youth, who is troubled with fits of kleptomania, a lady's maid is introduced into the house. The best man, knowing the groom is subject to taking things, unconsciously, that do not belong to him, tries with the bride, who knows his failing, to keep this a secret. The lady's maid turns out to be an advance agent for a thief, a man whom she is to marry. He arrives after she has looked over the place, and together they lay ingenious plans for relieving the house of the wedding presents. The easy-going thief is thought, by the kleptomaniac, to be the detective he had sent for, and accuses himself of having removed the valuables that are already beginning to disappear. The absent-minded parent hands the thief his money and asks him to keep it for him. Other members of the family confide in the thief the whereabouts of their valuables. Just as the two thieves have gotten everything in the house together and are making ready for their escape, a capitalist, who demands certain stock which he had given to the absent-minded parent as collateral for a loan, enters. The stocks cannot be found, the capitalist's money disappears, and he threatens punishment for everybody, and goes out in search of a warrant. The officers enter with a warrant; the warrant is

stolen, then deposited carefully in the absent-minded one's pocket. The officers, waiting for another warrant, hold the household while the thieves are trying to escape. The kleptomaniac tries to avoid the consequences of his innocent depredations, and his wife tries to find out what the absent-minded one has concealed about his person. The money is eventually found in possession of the minister, the thieves hold up the whole party at the point of a pistol, and in conclusion the absent-minded parent re-enters with all the booty which he, single-handed, has recovered.

The idea of introducing into a respectable household thieves masquerading under the guise of respectability for the purpose of plunder is also old. This appeared in the play "Black Birds." The court has been furnished with a copy of this composition. There two clever confidence operators scheme a plot to extort money from a rich Detroit family. Under false names, they become guests of their victims, and employ an agent for effecting a marriage between the daughter of the host and a titled gentleman (one of the schemers). After an interview with a religious old grandmother, one of the schemers is conscience stricken. She reforms and assists her confederate, with whom she is in love, to escape from the police, who are about to arrest him for a crime committed in London.

In "Secret Strings," staged in New York in December, 1914, the leading lady associates with a band of crooks, who plot to rob a countess of her magnificent jewels, and in the moment of triumph is surprised by a drawn revolver, and simultaneously the count and countess reveal themselves to be two noted detectives, who have been playing the parts assigned them to lure and arrest the famous criminal of whose intentions they have been fully forewarned. The leading lady, however, makes her escape by a trick in disarming the chief detective. She then is able to look forward in expectation of a life of happiness with the man she loves. Thieves and police officers have been staged together in hundreds of plays. It was well illustrated in recent years in a most successful drama, "Within the Law."

There is an important distinction between copyrights and patents. Letters patent give a monopoly to make, vend, and use, while copyright does not give an exclusive right to use. Copyright protection is extended to authors, mainly with a view to inducing them to give their ideas to the public, so that they may be added to the intellectual store, accessible to the people, and that they may be used for the intellectual advancement of mankind. It was well put by Lord Mansfield in Sayre v. Moore, 1 East, 361, when he said:

"We must take care to guard against two extremes equally prejudicial: The one that men of ability, who have employed their time for the service of the community, may not be deprived of their just merits and the reward of their ingenuity and labor; the other, that the world may not be deprived of improvements, nor the progress of the arts be retarded. The act that secures copyright to authors guards against the piracy of the words and sentiments, but it does not prohibit writing on the same subject."

An author may have no monopoly upon any theory propounded by him, or in the speculations by which he has supported it, nor even in

the use of the published results of his own observations.   Baker v.
Selden, 101 U. S. 99, 25 L. Ed. 841; Bauer v. O'Donnell, 229 U. S.
1, 33 Sup. Ct. 616, 57 L. Ed. 1041, 50 L. R. A. (N. S.) 1185, Ann.
Cas. 1915A, 150.  In Chatterton v. Cave, 3 App. Cas. 483, Lord Black-
burn said:

> "An idea may be taken from a drama and used in forming another, without
> the representation of the second being a representation of any part of the
> first.   For example, I have no doubt that Sheridan, in composing 'The Critic,'
> took the idea from 'The Rehearsal'; but I think it would be an abuse of
> language to say that those who represent 'The Critic' represent 'The Re-
> hearsal' or any part thereof; and if it were left to me to find the fact, I
> should, without hesitation, find that they did not."

The resemblances between the two dramatic compositions, I am of
the opinion, are minor instances and are not important.   The copy-
right cannot protect the fundamental plot, which is common property,
as was pointed out above, long before the story was written.   It will,
of course, protect the author, who adds elements of literary value to
the old plot; but it will not prohibit the presentation by some one
else of the same old plot without the particular embellishments.   Lon-
don v. Biograph, 231 Fed. 696, 145 C. C. A. 582.

[3]  Upon careful reading of both manuscripts, I can find no copy
or intimation, plot, scene, dialogue, sentiment, or characters, aside
from the general features and subjects, which are pointed out in the
above as clearly open to common use.   The court should be particu-
larly hesitant about granting a preliminary injunction after months
of delay, and where it appears, by the affidavits of the defendants, that
they did not know of the existence of the plaintiffs' manuscript until
the commencement of this suit.

The motion for a preliminary injunction pendente lite will be de-
nied.