### ECHEVARRIA v. WARNER BROS. PICTURES, Inc., et al.

District Court, S. D. California, Central Division.

Oct. 30, 1935.

William Barnett Spivak, of Los Angeles, Cal., for complainant.

Freston & Files and Clarence M. Hanson, all of Los Angeles, Cal., for defendants.

YANKWICH, District Judge (after stating the facts as above).

The right of a person in literary work exists at common law, and may be protected irrespective of copyright. The law of copyright has merely provided an additional method whereby an author by registering his work establishes his right as of the date of registration with the Register of Copyrights, so that he may be in a position to show by the official registration the date of the publication of his original composition. The right which the copyright law protects differs in no respect from any other form of personal property in the protection which the common law throws about it. Its basis is the right to every one to the fruit of his labor. These principles are adverted to merely for the purpose of emphasizing the foundation upon which the law of copyright is based.

The law is desirous of protecting a person in the fruits of his literary labors. In determining whether there has been use or appropriation of the labor of another, whether under the common law or under the law of copyright, certain fundamental principles apply.

In 13 Corpus Juris, I find on page 1145 a very succinct statement of the principles applicable to dramatic works: "Dramatic compositions are the most valuable of all literary works, and for that reason are entitled to a great measure of protection. The unauthorized performance of a single scene in a copyright play may constitute an infringement. And in the case of copyright in books or other literary works the part taken must be material, and there must be a substantial identity, pro tanto, with the original composition in order to constitute piracy, and that identity must be due to copying and not to mere coincidence such as may exist even in the case of works independently produced. Where the two productions produced the impression on spectators that they were substantially the same, one will be held to be a colorable imitation of the other. But a substantial similarity founded on coincidence, or the use of old or stock situations, or common sources, and not the result of piracy, direct or indirect, is insufficient to establish infringement; nor is the taking of a general idea or scheme sufficient. The common stock of dramatic ideas cannot be exclusively appropriated by anyone. Originality in dealing with incidents familiar in life or fiction lies in the association and grouping of those incidents in such a manner that the work under consideration presents a new construction or a novel arrangement of events. A copyright protects this element of originality, and it is an infringement to appropriate a novel combination of old or stock situations, or to take elements of literary or dramatic value with which an author has dressed up an old plot. An indirect, as well as a direct taking constitutes an infringement."

In the note to this text are found many cases. I find reference to a well-known English case, Chatterton v. Cave, 3 A. C. 483, 501, in which it is said: "An idea may be taken from a drama and used in forming another without the representation of the second being a representation of any part of the first. For example,—I have no doubt that Sheridan, in composing 'The Critic' took the idea from 'The Rehearsal,' but I think it would be an abuse of language to say that those who represent 'The Critic' represent 'The Rehearsal' or any part thereof; and, if it were left to me to find the fact, I should, without hesitation, find that they did not." This statement is quoted with approval in Eichel v. Marcin (D. C. N. Y. 1913) 241 F. 404, 408.

The dramatic situations which form the stuff of drama are few. The entire dramatic literature of the world can be reduced to some three dozen situations. In fact, an ingenious Frenchman has written a book in which, after analyzing the entire dramatic literature from the time of the Greek and Hindu dramas to the present time, he concludes that all these dramatic works present, in variant form, the few situations which he has analyzed. A rule, therefore, which would place originality *not in the manner of treatment of a theme,* but *in the theme,* would place the "hack writer" upon the same footing with the genius. And so the law, realistic in this respect, places originality where it belongs. In the books dealing with the subject, and particularly in the series of books which the United States government has published on copyrights, being Copyright Office Bulletins Nos. 17, 18, and 19, and subsequent volumes, we find many illustrations of the application of the general principles which are stated in the quotation from Corpus Juris. I wish to refer to some of them, chosen from a large mass of material I have accumulated in the trial of cases of this character. Where plays

are dissimilar in thought, character, text, and situations, there can be no infringement merely because both made use of an old situation. This is particularly true where the points of essential difference so far outnumber the points of similarity that "it is difficult to understand how any one could persuade himself that the one was borrowed from the other." Hubges v. Belasco (C. C. N. Y. 1904) 130 F. 388; Stevenson v. Harris (D. C. N. Y. 1917) 238 F. 432.

█ Even though there are characters in both plays having similarity and some instances of similar phraseology, when the theory of the two plays is entirely different, there is no infringement. Vernon v. Sam S. & Lee Shubert, Inc. (D. C. N. Y. 1915) 220 F. 694. The connection between the two works must be obvious to the ordinary reader or observer. Bachman v. Belasco (C. C. A. 2d Cir. 1915) 224 F. 817; Roe-Lawton v. Hal. E. Roach Studios (D. C. Cal. 1927) 18 F.(2d) 126. Protection is extended to the means of expression, not to the plot. Dymow v. Bolton (C. C. A. 2d Cir. 1926) 11 F.(2d) 690; Eichel v. Marcin, supra; London v. Biograph Co. (C. C. A. 2d Cir. 1916) 231 F. 696.

█ A person may take the same fundamental idea as that of another work, and if in developing it the incidents in which it is developed are substantially different, if the idea is worked out on different lines, so that the two works bear no real resemblance to each other, there will be no infringement: Rees v. Melville, MacGillivaray Copyright Cases, 1910–1916, p. 168; Bagge v. Miller (Ch. D.) MacGillivaray Copyright Cases, 1917–1923, p. 178.

In Bagge v. Miller, supra, although the central idea of a sketch and a. play was found to be the same (compulsory truth-telling by means of a bet), the idea being stock, no infringement was found to exist.

In another English case, Vining v. Evett, MacGillivaray Copyright Cases, 1910–1916, p. 188, the court made a similar ruling where the story turned around a band of brigands with a lair in the mountains. The court held that choosing the mountains as the locale for the story, even in conjunction with the fact that in both stories the plot turned around a band of brigands who had a lair in the mountains, was not an infringement, because the idea was stock.

In Eichel v. Marcin, supra, the court was confronted with a. claim of similarity between the two stories, "Cheating Cheaters" and "Wedding Presents," both being "crook plays" of the type that was rather common at the time. In discussing the question of similarity the court uses this language: "The object of copyright is to promote science and the useful arts. If an author, by originating a new arrangement and form of expression of certain ideas or conceptions, could withdraw these ideas or conceptions from the stock of materials to be used by other authors, each copyright would narrow the field of thought open for development and exploitation, and science, poetry, narrative, and dramatic fiction and other branches of literature would be hindered by copyright, instead of being promoted. A poem consists of words, expressing conceptions of words or lines of thoughts; but copyright in the poem gives no monopoly in the separate words, or in the ideas, conception, or facts expressed or described by the words. A copyright extends only to the arrangement of the words. A copyright does not give a monopoly in any incident in a play. Other authors have the right to exploit the facts, experiences, field of thought, and general ideas, provided they do not substantially copy a concrete form, in which the circumstances and ideas have been developed, arranged, and put into shape. Holmes v. Hurst [1899] 174 U. S. 82, 19 S. Ct. 606, 43 L. Ed. 904. The plaintiffs have prepared a chart, in which they point out the similarities in the two plays, and they claim that their composition may be called a 'crook play,' in which two bands of crooks are trying to cheat each other, and that the subjects of their cheating are some famous jewels; further, that both plays deal with thieves masquerading as respectable citizens, detectives, and robbery planned and carried out as an inside job, and then that the big surprise is that the leading crook is in reality a detective, and then, of course, a love affair. But the idea of showing a band of thieves in action is as old as the idea of a man impersonating a female for the purpose of detecting a crime."

After referring to some other plays in which similar incidents have been used, the opinion continues:

"There is an important distinction between copyrights and patents. Letters patent give a monopoly to make, vend, and

use, while copyright does not give an exclusive right to use. Copyright protection is extended to authors, mainly with a view to inducing them to give their ideas to the public, so that they may be added to the intellectual store, accessible to the people, and that they may be used for the intellectual advancement of mankind.

"It was well put by Lord Mansfield in Sayre v. Moore, 1 East, 361, when he said: 'We must take care to guard against two extremes equally prejudicial: The one that men of ability, who have employed their time for the service of the community, may not be deprived of their just merits and the reward of their ingenuity and labor; the other, that the world may not be deprived of improvements, nor the progress of the arts be retarded. The act that secures copyright to authors guards against the piracy of the words and sentiments, but it does not prohibit writing on the same subject.'"

The opinion then states: "The resemblances between the two dramatic compositions, I am of the opinion, are minor instances and are not important. The copyright cannot protect the fundamental plot, which is common property, as was pointed out above, long before the story was written. It will, of course, protect the author, who adds elements of literary value to the old plot; but. it will not prohibit the presentation by some one else of the same old plot without the particular embellishments."

In Underhill v. Belasco (D. C. N. Y. 1918) 254 F. 838, the court had before it two dramatic productions. It was claimed that the play produced by Mr. Belasco under the title "Marie Odile" was an infringement of the Spanish play written by Gregorio Martinez Sierra, and translated by John G. Underhill; the translation having been copyrighted. Both plays depict convent life, and the court, after analyzing the two, held that such similarity as existed between them was fortuitous; that it had to arise from the very nature of the play; that any one writing a play dealing with convent life would necessarily strike upon certain particular phases; and that there was no infringement of copyright.

There is another interesting case which deals with a situation of the type which confronts us here. Simonton v. Gordon (D. C. N. Y. 1924) 297 F. 625.

In that case similarity was claimed between the well-known play "White Cargo" and the book called "Hell's Playground," both dealing with Africa, both dealing with local color and the deteriorating influence of African climate, particularly on whites, with the conventional stock figures of traders, missionaries, and black servants, and with the prevailing customs. Although the court was of the view that there was some similarity between the works, the variety of treatment, the fact that in one case an illicit relationship which adds to the degradation of the man is emphasized, while in the other an actual marriage relation with a half-caste is the nucleus around which the play turns, was held sufficient to show the lack of similarity between the two.

Many other cases of similar character can be found (see cases, infra) which show the basis upon which courts determine the question whether there has been an infringement of copyright.

These principles must be borne in mind in every case. They must be borne in mind in the present case. In dealing with a dramatic situation, the plot, i. e. the idea, and the arrangement of the incidents, the dialogue, and the working out of the plot must be considered. We must also consider the stock incidents (clichés, as the French call them) which are so common in the literature of the world as to have become the common coin which any one may pick up.

From the reading of the text of the synopsis and the view of the photoplay, I have made what might be called a "juxtaposition" of the play "Across the Pacific" and the synopsis "Nulias Filias," from which plaintiff claims the play was taken in whole or in part. This juxtaposition consists of a comparison of both the themes and their development.

The theme of Nulias Filias may be stated as follows: A historical event—the winning of a war between the United States and the Philippines, brought on through the betrayal of a native woman, whose reward is marriage to an American officer after peace is declared. The theme of Across the Pacific is the triumph of duty over love expressed in the story of an American officer who, at the behest of his commander-in-chief, feigns love for a native woman in order to obtain secrets for his government. In the synopsis, the

native woman is and remains always a betrayer of her people whose reward is marriage to an alien officer. In the photoplay, the native girl is and always remains loyal to her people, willing to give information to the man she loves, but savage in her denunciation when she discovered that his love was sham and was a means of securing from her the secrets of her people.

The synopsis condemns treachery, while the photoplay exalts duty, even though treachery may be the means of accomplishing it.

The development of the theme in the synopsis is complicated by many characters which find no duplication in the photoplay, as the plaintiff readily and frankly admitted at the trial in answer to questions by the court. The native girl is in love with a native who leaves her in order to make a rich marriage in the States. The war comes on. The native girl and her mother are taken prisoners by the native insurrectors. There is a plot to assassinate Admiral Dewey of the United States naval forces. There is a murder implicating the native girl and her newly found admirer, an American officer. He is instrumental in having her acquitted. A second war between the Filipinos and the Americans takes place. The native girl becomes a nurse and, as such, she nurses her newly found American admirer. She helps him to escape, taking with her some important documents which are delivered to General Funston. The native girl and the lieutenant set fire to a jail adjoining the hospital. Here follow all kinds of exciting events—the girl changing from her nurse's uniform to that of a soldier, a hot pursuit by a detachment of cavalry, a hospital fire, and finally the surrender of Aguinaldo to Funston, peace, and the marriage between the native girl and the American.

In the photoplay, the method is entirely different. It conforms to the simple treatment of stories with a war motif. Change the uniform and it is reminiscent of plays of the Revolutionary War, or plays relating to the Civil War, or plays relating to the World War. There is always the young man who, because of his own or his family's disgrace, is separated from his sweetheart and tries to forget by joining the army. He becomes a hero, and after the war is over "Johnny Comes Marching Home" with the girl on his arm.

The incidental plot is simple. The father, an officer in the American army, separates them because of the suicide of the boy's father. War is declared. The Filipinos face Funston. Aguinaldo, the Filipino leader, is surrounded by a group of desperate characters including the always-oily oriental who does "the dirty work"; in this case, a Chinese-looking character named "Kato." You are always certain, whenever he appears, that in the last scene he will be killed by the hero or by his friends. Inevitably, the girl also finds her way to the Philippines to be near her father. The native girl is brought in, a sensuous girl who is interested in snaring the American soldier. The boy becomes convinced that the native girl is a spy. He so informs his commanding officer. The commanding officer orders him to make love to the girl in order to find the whereabouts of Aguinaldo. From then on the story unfolds in the usual manner, with the American girl seeking to take him away from the native girl, ready to marry a worthless American captain who has been the native girl's lover until—the boy, having obtained from the native girl the plans showing the whereabouts of Aguinaldo, and having turned them over to his commanding officer—fierce fighting takes place resulting in victory for the American Forces. This does not happen, however, until, as is usual in stories of this character, the boy had narrowly escaped death at the hands of many people, including escape from the dagger of the native girl. War is over and the last scene finds the boy and girl on the deck of the home-bound ship.

In the synopsis, we have plot upon plot, attempted murders, prison escapes, disguises, the firing of jails and hospitals, not one, but two wars, culminating in the reward of the treachery of a woman by a successful marriage. In the photoplay we have an ordinary plot carried through simply, aiming to exalt duty above love; the other incidents being so arranged as to carry out this simple theme.

The only similarity that exists between the two is in the fact that in both the protagonists of the two nations at war were Aguinaldo and Funston. But even as to that, the synopsis complicates the matter by bringing in Admiral Dewey in the first part of the story and having all sorts of plots around him, including an attempted assassination of him. But these characters are not fictitious. They are real historical characters. The incident of

Aguinaldo's surrender is a historical fact. It actually took place, and the American officer to whom he surrendered was Funston. It is claimed by the writer that the path of the American army to Aguinaldo is original. The fact remains, however, that in his synopsis there is no direction indicating that the army was to go through a jungle and wade through a river. All that is indicated is that a detachment of cavalry pursued the native girl "through the almost pathless jungles."

■ Originality cannot be predicated upon similarity of locale. See Vining v. Evett, supra; Stevenson v. Harris, supra; Underhill v. Belasco, supra; Simonton v. Gordon, supra. See, also, Nichols v. Universal Pictures Corporation (C. C. A. 2d Cir. 1930) 45 F.(2d) 119; Wiren v. Shubert Theatre Corporation (D. C. N. Y. 1933) 5 F. Supp. 358; Sheldon v. Metro-Goldwyn Pictures Corporation (D. C. N. Y. 1934) 7 F. Supp. 837; Ornstein v. Paramount Productions, Inc. (D. C. N. Y. 1935) 9 F. Supp. 896.

Nothing indicates the lack of similarity so much as the climaxes of the two works. In the synopsis, we have the marriage of the native girl and the American officer, a fact which would be shocking to any American audience and which no American producer would dare depict, because it goes counter to the objection of the Caucasian American to intermarriage with the yellow or Malay races. In many states, including California, such marriage has been absolutely forbidden, at least in recent years. In the photoplay the native girl returns to her people and the American soldier marries the American girl.

■ I might point out other dissimilarities. But those adverted to do (I believe) full justice to both the synopsis and the photoplay, and are sufficient. The result, to my mind, is that, on reading the synopsis and viewing the photoplay, it is hard to understand how an ordinary observer or playgoer—and they are the persons to whom resort must be had for a test of similarity, see Dymow v. Bolton, supra; Harold Lloyd Corporation v. Witwer (C. C. A. 9th Cir. 1933) 65 F.(2d) 1, 18, 19—by reading the one and seeing the other, could get any impression of similarity, especially of the type of similarity which is actionable as an infringement of copyright. Much less would a person with literary training.

■ One cannot build a story around a historical incident and then claim exclusive right to the use of the incident. If originality can be claimed in opposing Aguinaldo to Funston, as the plaintiff claimed in open court, then all the novels, short stories, and dramas written about the Civil War, opposing Grant and Lee, might never have been written after the first one because the author of the first one could have claimed exclusive right to the product.

I am not endeavoring to do (what we call in logic) a reductio ad absurdum. But I am merely trying to give a summation of the claim that plaintiff, in his testimony, has made, in this trial, and its effect.

The conclusion is that, leaving aside one incident which places the two national heroes in conflict—which is a historical incident—there is no similarity whatever between the plays. I do not even have to resort to the doctrine of stock plots in order to reach the conclusion that the photoplay was *not* based upon the synopsis.

■ I have assumed in this analysis that there is evidence to show access. In a copyright infringement, an important element to be proved by the plaintiff is the infringer's access to the product. Ordinarily, of course, after a literary work is published, it is accessible to every one. And if there be actual infringement, mere priority is sufficient. Even in those instances, however, the similarity may be the fortuitous similarity of conception. Access becomes important where, as here, the publication in which the synopsis appeared is not one in general circulation, accessible to any one who pays the price. It was evidently not for sale to the general public and was sent to a selected list only. There is no claim of knowledge of the contents of the synopsis except through such mailing. I doubt if the testimony on the subject shows access. The proprietor of the magazine in which the synopsis was published (Mr. E. L. Wertheim) merely testified that it had been his custom since the Scenario Bulletin Review was established to have his employees mail each issue to the major studios. He was frank to state that he did not know whether this was done with the particular issue. He could not tell whether Mr. Darryl Zanuck, who is given credit for the photoplay, was on the mailing list, or whether a copy of this particular issue reached him. So, to in-

dulge in the inference that there was access, we must assume not only that employees did the usual thing in the course of business, but also that a copy of this issue actually reached the particular director who produced the photoplay. I do not think there is any fact in this case from which such an inference can be drawn.

■ However, assuming that there was access, I am satisfied that there is absolutely no similarity between the two plays; that there is nothing contained in the photoplay which by any stretch of the imagination could be said to be original with the writer of the synopsis.

The conclusion, therefore, is that the plaintiff has not established a prima facie case, and the motion for a nonsuit will be granted.