Gene MILLER, Plaintiff,

v.

UNIVERSAL CITY STUDIOS, INC., American Broadcasting Companies and Post-Newsweek Stations Florida, Inc., Defendants.

No. 75–1821–Civ–NCR.

United States District Court,
S. D. Florida,
Ft. Lauderdale Division.

Oct. 31, 1978.

Irwin J. Block, Fine Jacobson Block Goldberg & Semet, P.A., Miami, Fla., for plaintiff.

Barry R. Davidson, Steel Hector & Davis, Miami, Fla., for defendants.

## ORDER

ROETTGER, District Judge.

Plaintiff recovered for copyright infringement a verdict in excess of $200,000 against defendants and the matter is before the court on defendants' motion for a new trial.

Plaintiff is a reporter with the Miami Herald who has twice received a Pulitzer prize for general local reporting, an accomplishment achieved by no other reporter. The origins of this case spring from his reporting the story of the Barbara Mackle kidnapping, a diabolical crime which occurred at the beginning of the college Christmas vacation in December 1971.

Barbara Mackle, the daughter of a wealthy Florida land development company officer, was attending college in Atlanta. Her abductors took her from an Atlanta

motel room where she had been staying with her mother because the college infirmary was overcrowded due to a flu epidemic. She was placed in a coffin-like container, having certain self-contained ventilating systems and buried alive in the Georgia woods. She was rescued from the box on the fifth day, not long before the life-sustaining capability of the coffin-box was to expire.

Miller and Barbara Mackle agreed to write the book together about her kidnapping—she was to relate the events to him and Miller was to write it. The book produced was titled *83 Hours Till Dawn*. Barbara Mackle assigned her interest in the litigation to plaintiff.

At the close of plaintiff's case the court directed a verdict for defendants on the issues of unfair competition and punitive damages. The issue was submitted to the jury on the question of copyright infringement and the jury returned a verdict of $185,000 for damages—an intriguing amount inasmuch as it exceeded the amount plaintiff requested in closing argument. In addition, the verdict included loss of profits, as follows: against Universal for $16,000.00; ABC for $15,000.00 and defendant Post-Newsweek (TV Channel 10 in Miami) for $750.00. The trial was bifurcated and the same jury, which first determined that infringement by defendants had occurred, heard the evidence on damages and entered an award.

Plaintiff's technique consisted of personal research and interviews with the participants in the drama; he estimated an expenditure of more than 2500 hours in the preparation of the book. The writing technique is similar to that familiar to readers in recent years describing specific crimes: e. g. Truman Capote's *In Cold Blood* and Thompson's *Blood Money*. Similar styles are also found in descriptions of historical events, such as Cornelius Ryan's *The Longest Day* and *The Last Hundred Days*; Walter Lord's *A Day In Infamy* and *Incredible Victory*; among others.

Miller testified as to a number of similarities between his book and both the script and film. Among the similarities, the source of which is found only in his book are the following:

the second call of the priest;

the kidnapper's description of the box—a "room";

the phrase of the kidnapper to Barbara Mackle: "poor little rich girl"—in fact, Barbara Mackle described it to plaintiff as "little rich girl" and Miller modified it in his book. In the script the phrase "poor little rich girl" is pencilled in; it also appears in the film;

Miller's insertion of the phone call from a friend to the Mackle house where F.B.I. agents answer the phone as a means of literary relief;

the F.B.I.'s idea of using a double to deliver the ransom as well as the plan to put an agent in the trunk for protection;

and Barbara's sucking water out of a tube while in the box.

Significantly, the operator who received a call from the kidnapper giving the location of the "coffin" died within three months after the trial; she did not testify at the trial and Miller interviewed her immediately after the trial. His book is the only source as to her version of the events.

Even mistakes made by Miller were copied into the film: the want ad—the medium required to respond to the kidnappers—was located in the same place both in the book and the film although it actually appeared in a different location.

William Frye, a producer for Universal, read Miller's account of the kidnapping in a doctor's office. He thought it would be an excellent television film or movie and circulated the magazine at the studio. In addition, he told plaintiff he was interested in making a movie and that it would be an excellent TV film. He gave a copy of the book to Gerard, the script writer, and never received it back.

In February of 1972, Frye called Miller about purchasing the rights and offered him $15,000.00. Miller refused it and asked for $200,000. Frye indicated he might go as high as $25,000 but no agreement was

reached and plaintiff was not paid for the rights:

The writer, Gerard, read the *Readers' Digest* article in January or February, 1972 and thought it would be a good story for a movie of the week. He claimed he went to the library and read for one-to-two hours but admitted that he had written a good deal of the script before the transcript of the court proceedings arrived. He used the transcript to check facts. By April 21, 1972 a full run of the script was completed and 150 copies distributed. He admitted he might have looked at the book or the *Readers' Digest* article even after April 5th to check matters not available elsewhere. He testified he thought a deal had been made with Miller for the rights and he could proceed on that basis.

Particularly damning evidence against defendants was the "smoking gun exhibit", a memo from Gerard to Frye dated March 7, 1972, which states as follows:

"In examining the work I have completed to date in the light of Cliff Phillip's memo of caution, I find I am really flying blind.

The news stories I was able to find in the main library and those I received from Research are far too general, and contain almost no detail to support the scenes I have written. In addition, the 'True Detective' story of the case that Research dug up contains some important inconsistencies with the material in the book and the 'Reader's Digest' version.

The newspaper stories from Miami and Atlanta and the trial transcript that Research wrote for weeks ago would undoubtedly supply all the information I would need, but to date none of it has arrived. Consequently all I have to go on—and have been using while waiting— is the book, and that is verboten.

In the light of all this, I can only suggest that I wait until the source material arrives before proceeding, or go to Miami and Atlanta myself and do my own digging, so that I will not continue to write pages that will in all likelihood have to be completely altered.

If the decision is for me to go, in the light Mr. Mackle's telephone call, telegram, etc., perhaps I should have a bodyguard while I am in Mr. Mackle's territory. I am only half kidding.

Incidentally, I have a working title, 'THE LONGEST NIGHT'."

Universal's television film, found by the jury to have infringed plaintiff's copyright, was entitled THE LONGEST NIGHT and shown nationally by ABC and locally in the Miami area by local Post-Newsweek station, Channel 10.

The preceding evidence alone would have amply justified the finding of infringement by defendants. In addition, plaintiff introduced other evidence of infringement plus an expert opinion, all amply buttressing the jury's conclusion of infringement. Further, the jury had convincing visual evidence of the writer Gerard's squirming and fidgeting on the witness stand indicating that he had plagiarized plaintiff's book.

 Although defendants have listed numerous bases for a new trial [1] the court

---

1. One of defendants' bases is that a new trial should be granted because the court refused to allow their expert witness, Professor Sullivan to testify. This exclusion was imposed as a sanction for the witness' violation of Rule 615 of Federal Rules of Evidence. The Rule was violated by Professor Sullivan with the intentional cooperation of defendants' counsel in that defendants' counsel provided Professor Sullivan with transcribed portions of the testimony of Gene Miller, conduct completely unnecessary for the witness to express his opinion of lack of infringement.

Rule 615 is silent on the consequences of noncompliance with an order of sequestration. It

is generally held that whether a witness who has violated such an order is to be permitted to testify is "left to the sound discretion of the trial court." *U. S. v. Suarez,* 487 F.2d 236, 238 (5th Cir. 1973). In light of *Holder v. U. S.,* 150 U.S. 91, 14 S.Ct. 10, 37 L.Ed. 1010 (1893) and its progeny, see, e. g., *U. S. v. Schaefer,* 299 F.2d 625 (7th Cir. 1962), it is clear that the court's right to exercise its discretion to exclude a witness is limited to those cases where "the defendant or his counsel have somehow cooperated in the violation of the order [of sequestration]," *U. S. v. Tolbert,* 496 F.2d 154, 157 (9th Cir. 1974). In the instant case, as stated previously, defendants' counsel have ad-

feels only one needs extensive discussion in this order. That ground is the contention that the court erred in failing to give defendant's proposed instruction concerning originality and the importance of research. The instruction which the court gave to the jury which is comparable to defendants' proposed instruction No. 8 (second set)[2] reads in its entirety as follows:

Similarly in a case like the instant one which deals with factual matters such as news events the facts themselves are not copyrightable but the form of expression of the facts and their arrangement and selection are copyrightable. Moreover, if an author in writing a book concerning factual matters engages in research on those matters his research is copyrightable. As was the case with ideas, if the expression, arrangement and selection of the facts must necessarily by the nature of the facts be formulated in given ways then they are not copyrightable.

Stripped to its essentials the difference between the court's instruction and defendants' instruction is that the court's statement that research is copyrightable. Therefore, the court's reasons for including this statement will be elaborated.

As the court's instructions make clear, the court, in accordance with defendants' proposed instruction and traditional copyright law, accepts the truism that "historical facts and events in themselves are in the public domain and are not entitled to copyright protection," *Lake v. Columbia Broadcasting System, Inc.*, 140 F.Supp. 707, 708–709 (S.D.Cal.1956). The court does not seek to challenge nor does it see any basis in precedent to challenge the distinction between uncopyrightable fact, *Echevarria v. Warner Brothers Pictures*, 12 F.Supp. 632, 638 (S.D.Cal.1935), and the copyrightable expression of fact. *Holdredge v. Knight Publishing Corp.*, 214 F.Supp. 921, 923 (S.D. Cal.1963).

The law is clear that research can be copyrightable. *Toksvig v. Bruce Publishing Co.*, 181 F.2d 664 (7th Cir. 1950); *Leon v. Pacific Telephone & Telegraph Co.*, 91 F.2d 484, 486 (9th Cir. 1937); *H. C. Wainwright & Co. v. Wall Street Transcript Corp.*, 418 F.Supp. 620, 623 (S.D.N.Y.1976); *Southwestern Bell Telephone Co. v. Nationwide Independent Directory Service, Inc.*, 371 F.Supp. 900, 905 (W.D.Ark.1974); *Huie v. National Broadcasting Co.*, 184 F.Supp. 198, 200 (S.D.N.Y.1960); but see *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 309–310 (2nd Cir. 1966).

The court views the labor and expense of the research involved in the obtaining of those uncopyrightable facts to be intellectually distinct from those facts and more similar to the expression of the facts than to the facts themselves. The Second Circuit said that the distinction in copyright between the expression of an idea and the idea is an attempt "to reconcile two compet-

---

mitted that they cooperated with Professor Sullivan in his violation of the order and indeed they were apparently the primary force in the witness' violation of the order. Defendant invokes an alleged custom allowing such behavior on the part of counsel and asserts a violation of the court's order by plaintiff's expert witness. However, the alleged custom was not established and defendant did not prove a violation of the court's order by plaintiff. The court finds that it acted within its discretion and moreover acted correctly.

**2.** Defendants' proposed instruction No. 8 reads as follows:

The plaintiff has offered evidence that he expended a great deal of effort in researching and writing his book or work. It is important that you understand the legal significance of this evidence.

No matter how great his effort in discovering the facts, plaintiff may not monopolize those facts because they are historical facts and everyone has the right to write about and communicate them to the public. The law encourages later writers to refer to and use earlier writings dealing with the same subject matter and occasionally even to quote directly from such works. This practice is permitted because of the public benefit encouraging the development of historical and biographical works and their public distribution. Writers are not prohibited from referring to prior works because to do would simply result in wasted duplication of effort. The notion that ideas and facts may not be copyrighted is designed to prevent and eliminate the need for just such wasted effort. It is for you to determine what portions of plaintiff's work constitute historical facts and ideas. (Footnotes omitted).

988

ing interests: rewarding an individual's ingenuity and effort while at the same time permitting the nation to benefit from further improvements or progress resulting from others' use of the same subject matter." *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2nd Cir. 1976).

Obviously the same competing principles have resulted in the development of the distinction between the expression of a fact and the fact. As it is necessary to reward the effort and ingenuity involved in giving expression to a fact, it is necessary also, if we are to expect individuals to labor on our behalf, to reward the effort and ingenuity involved in obtaining knowledge of the fact. It further appears to the court that other individuals are not deprived of the opportunity of obtaining knowledge of facts by one individual's copyright of his research of those facts and that therefore the nation may still benefit from further improvements or progress resulting from other individuals' use of those facts. Judge Learned Hand said it best:

> Any subsequent person is, of course, free to use all works in the public domain as sources for his compositions. . . . But there is no reason in justice or law why he should not be compelled to resort to the earlier works themselves, or why he should be free to use the composition of another, who himself has not borrowed. If he claims the rights of the public, let him use them; he picks the brains of the copyright owner as much, whether his original composition be old or new. The defendant's concern lest the public should be shut off from the use of works in the public domain is therefore illusory; no one suggests it. That domain is open to all who tread it; not to those who invade the closes of others, however similar. *Fred Fisher, Inc. v. Dillingham*, 298 F. 145, 150–151 (S.D.N.Y. 1924).

■ To this court it doesn't square with reason or common sense to believe that Gene Miller would have undertaken the research involved in writing of *83 Hours Till Dawn* (or to cite another more famous example, that Truman Capote would have undertaken the research required to write *In Cold Blood*) if the author thought that upon completion of the book a movie producer or television network could simply come along and take the profits of the books and his research from him. In the age of television "docudrama" to hold other than research is copyrightable is to violate the spirit of the copyright law and to provide to those persons and corporations lacking in requisite diligence and ingenuity a license to steal.

The evidence of infringement was clear, convincing and overwhelming. Accordingly, it is

ORDERED AND ADJUDGED that the motion of defendants for new trial or in the alternative for new trial on damages is denied.