## CAREW v. R. K. O. RADIO PICTURES, Inc., et al.

### No. 824–Y–Civ.

District Court, S. D. California, Central Division.

Jan. 6, 1942.

Charles B. Taylor, of Los Angeles, Cal., for plaintiff.

Mitchell, Silberberg, Roth & Knupp and Ross R. Hastings, all of Los Angeles, Cal., for defendant R. K. O. Radio Pictures.

Freston & Files, of Los Angeles, Cal., for defendants Decca Distributing Corporation & Columbia Recording Corporation of California.

Samuel M. Roeder, of San Francisco, Cal., and Schwartz & Frohlich and L. D. Frohlich, all of New York City, for defendants Columbia Broadcasting System, Inc., and National Broadcasting Co., Inc., and Gene Buck, as President of American Soc. of Composers, Authors and Publishers.

Samuel M. Roeder, of San Francisco, Cal., for defendant American Society of Composers, Authors and Publishers.

YANKWICH, District Judge.

On the basis of accepted principles, the plaintiff has failed to show a prima

facie case. We have never, in the federal courts, adhered to the doctrine of the State courts which is carried to the extreme in California, that a scintilla of evidence is sufficient against a motion to dismiss (or a motion for a nonsuit). Courts of California have gone to the romantic length of saying that even if the testimony is such that the court would disbelieve it if it were passing upon the case on the merits, nevertheless, it must believe it and give it full credence on a motion for a nonsuit. With the result that if a judge believes that the sole witness for the plaintiff, because of his contradictory testimony, is not entitled to credence, he cannot grant a nonsuit at the conclusion of his testimony; but if the defendant rests without any evidence, the court can give judgment for him. See Estate of Ivey, 1928, 94 Cal. App. 576, 271 P. 559; Estate of Finkler, 1935, 3 Cal.2d 584, 46 P.2d 149. With us the rule is that there must be substantial evidence before the defendant is required to undertake the defense.

Cases involving musical compositions are not many, but the principles are very well established in the few decisions published. The plaintiff must prove access and identity. If there is no identity, access is, in itself, of no importance whatsoever. If there is identity, then access becomes an important matter, which may determine the claim. In determining access, one element is helpful, the element of time.

Ordinarily a composer, or a writer, for that matter, who has presented his composition, or who has played it or made it possible for someone else to hear it played, finds that, a short time after such occurrence, the song or the writing is being claimed by another.

Here the testimony is of a different character. We find a composer who copyrighted a song in 1926, and, thereafter, tried to dispose of it, peddle it, as it were, to various persons without any success whatsoever. The song was never published. And eleven years after, over the air, she hears a song, the words and ideas of which are totally dissimilar, but which carries the title she had given to her composition eleven years before.

There is no claim that she is entitled to the use of the word "Chatterbox" exclusively, because we have evidence in the record that a song with the same name was copyrighted at least sixteen years before. And courts are very reluctant to give to anyone a monopoly on ordinary words of the English language. Often that is a source of litigation.

I remember trying in the Superior Court, a plagiarism case involving the last silent picture in which Jean Hersholt appeared. It arose under the common law of piracy. The play was called "The Symphony". They used the Hollywood Bowl as the locale for the story of a man who was restored to reason by hearing his own composition played, a theme used in an opera years before. I am quite certain that the writer really thought that, because she had conceived the idea of using the Bowl as the locale, she was entitled in saecula saeculorum, as the catechism says, to the exclusive use of that idea. See my opinion in Echevarria v. Warner Bros. Pictures, Inc., D.C.Cal. 1935, 12 F.Supp. 632.

Here, the evidence of access is not convincing. I cannot conceive how a man like Jerome Brainan, the author of the alleged pirated song, who had played, at one time, a composition, and who, according to plaintiff's own testimony, was a successful composer, well known in the music world, would, deliberately, eleven years afterwards, borrow a phrase from it. The most that even the first expert of the plaintiff charges is that, in his opinion, the particular motive, as he called it, remained with the alleged plagiarist. A phrase from Beethoven, or from any other great composer, might linger in the mind of a student of music for many years. But I do not see how the trite phrasing of an ordinary popular song, with its limitations, could linger so continuously in the mind of a person, or so impress itself upon it, that, years afterwards, when he composes a song of his own, entitled "Chatterbox", the idea of which is entirely different from that expressed in the words of the other song, he would use a phrase from the first composition.

On the question of infringement, I think that the plaintiff's case must fall because of the admission of both of her experts that the two melodies, if played on the piano, or the two songs, if sung by any person, would not convey identity to the average listener. The courts have said that, ultimately, it is not the dissection to which a musical composition might be submitted under the microscopic eye of a mu-

sician which is the criterion of similarity, but the impression which the pirated song or phrase would carry to the average ear.

Back in 1887, we find Blume v. Spear, C. C., 30 F. 629. In that case, infringement was found to exist. Speaking of the test of similarity, and in showing that the particular composition was not similar to another composition which preceded it, Judge Wheeler laid down this rule: "The defendant has put in evidence a prior composition, entitled 'Sweet Spirit, Hear My Prayer,' to show that some parts of the music copyrighted were taken from that. There does not appear to be sufficient similarity between these two, however, to warrant this conclusion. There are some short parts of them which appear to be alike; but these parts are not continuous enough, nor sufficiently extended, to indicate with any degree of certainty that the author of the latter was guided or aided by the former."

Marks v. Leo Feist, Inc., 290 F. 959, 960, was decided by the Second Circuit Court of Appeals in 1923. I quote from the opinion: "Musical signs available for combinations are about 13 in number. They are tones produced by striking in succession the white and black keys as they are found on the keyboard of the piano. It is called the chromatic scale. In a popular song, the composer must write a composition arranging combinations of these tones limited by the range of the ordinary voice and by the skill of the ordinary player. To be successful, it must be a combination of tones that can be played as well as sung by almost any one. Necessarily, within these limits, there will be found some similarity of tone succession. Even different results may be obtained by varying the accent and tempo."

In Arnstein v. Edward B. Marks Music Corporation, 2 Cir., 1936, 82 F.2d 275, 277, Judge Hand said: "When the two songs are played, the phrases show no resemblance, at least to the untrained ear. To a mind already set to find piracy, this of course seems proof strong as Holy Writ, but it is really of no significance. A plagiarist might of course work in that way, seizing a sequence from the middle of a phrase in an accompaniment as a happy theme; but Altman was scarcely the man for that; his gifts were very limited, and to attribute to him the ingenuity and penetration so to truncate and modify, and thus really to create a melody out of other elements, is harder than to suppose that the extremely simple theme should have occurred to him out of his own mind. True, it is the themes which catch the popular fancy, but their invention is not where musical genius lies, as is apparent in the work of all the great masters. Success in such music as this is by no means a test of rarity or merit; it is a commonplace that the most experienced are usually unable to tell in advance what will hit the public fancy and what will not. Were it otherwise much waste could be avoided."

After analyzing the particular song, he concluded that, despite apparent similarity in what we have learned in this case to call "motive", it did not convey to the untrained ear identity, or even similarity.

In Hirsch v. Paramount Pictures, D.C., 17 F.Supp. 816, 818, decided in 1937, I summarized from these decisions and others, the cardinal principles which underlie cases of this character. I said there:

"Similarity is, ultimately, a question of fact, to be determined by a comparison of the two works.

"Expert testimony is helpful, especially in matters involving musical composition. But, in the end, the test—as pointed out by the Second Circuit in Arnstein v. Edward B. Marks Music Corp., supra—is resemblance noticeable to the average hearer.

"In the case of a musical composition, the similarity may arise out of the grouping of notes, similarity of bars, accent, harmony, or melody.

"The playing of the two compositions, both in recorded form and on the piano in the courtroom, carried no identity of melody to me, even when * * * they were played in the same key and tempo. The plaintiff's own expert admitted that the melodies were not identical. And the analysis of the structure and harmonies of the two songs by the defendants' experts showed conclusively the absence of identity of notes, bars, phrasing, harmony, and the other elements upon which the similarity of musical compositions must rest."

In the case before us, the defendants have not been heard, but it is to be noted that not one of the experts, not even the plaintiff, claims identity of melody discernible upon hearing the composition played or sung. The playing of the two compositions by the plaintiff's expert did not in-

dicate any similarity of melody to me. I did not even notice the identity of the theme, because the sequence of the notes had been changed.

After all, when you speak of chatter, you try to imitate a magpie; you do not say "chatter; chatterbox"; but sing, as it were, chatter, chatter, chatter—your emphasis is on the first syllable, because the word is akin to an onomatopoeic word. And the man who transmutes speech into music would carry that quality over into the music. Anyone can take apart a piece of music, and, as with a microscope, discern certain similarity in compositions of a popular nature, where the limit of originality is very narrow.

Judge Hand, when he was on the district court, wrote an opinion in Fred Fisher, Inc., v. Dillingham, D.C.1924, 298 F. 145, 147, in which he said: "The copyright to the composition 'Dardanella' covered the piece as a whole; there were not several copyrights for each part of it. Nevertheless the plagiarism of any substantial component part, either in melody or accompaniment would be the proper subject of such a suit as this. To sustain it, however, more must appear than the mere similarity or even identity, of the supposed infringement with the part in question. In this lies one distinction between a patent and a copyright. One may infringe a patent by the innocent reproduction of the machine patented, but the law imposes no prohibition upon those who, without copying, independently arrive at the precise combination or words or notes which have been copyrighted."

In Hirsch v. Paramount Pictures, supra, I said: "In determining the originality of a popular song, we are confronted with the fact that it is built upon a rather simple, accepted pattern. It has, as a rule, three parts in the chorus: the opening strain, which usually runs for eight bars and is repeated for another eight bars, a middle tune of eight bars, and a concluding eight bars, which repeat the first strain. * * * Similarity of tone succession, which is, to a certain degree, inevitable in all musical compositions, because of the limits of the chromatic scale, is more likely to appear within this narrow pattern. So that if, as Judge Hand has stated, Fred Fisher, Inc., v. Dillingham, D.C.N.Y.1924, 298 F. 145, a musical composition is original if it is 'the spontaneous, unsuggested result of the author's imagination,' originality in the realm of popular music lies within a very narrow scope. Slight variations in the use of rhythm, or harmony—of accent and tempo —may achieve it."

If we apply these principles to the case before us—overlooking the fact that no damage has been shown through any infringement, but conceding that, perhaps, under the broad prayers of the complaint, some kind of relief of an equitable nature could be granted—I do not think there is any substantial evidence to show that the accused song—to borrow a phrase from patent law—was copied from plaintiff's song, even if we admit that the evidence of access is adequate.

Certainly, we do not have that similarity in the grouping of the notes, or of the bars, or of accent, or of harmony, or of melody, upon which musical piracy must rest.

Even if it be conceded that there is a similarity in the motive, that in itself would not be sufficient to warrant a finding of infringement. As to that, however, I may say that the playing of the particular motive carried no idea of similarity to my ear. And one of the experts admitted that the only similarity lay in the use of two of the three notes, in reverse order. The ordinary words of the English language, used by the average person, amount to ordinary speech. The same words, woven into poetic speech by a Keats or Shelley, or any other great poet, sound like the most poetic words in the English language. Certainly, before we find plagiarism in a song, we should be able to find some substantial part in it, which can be traced to and discerned by the ordinary listener in the composition which it is claimed to infringe. I find none here.

The motion to dismiss will be granted.