### SCHWARZ v. UNIVERSAL PICTURES CO., Inc. et al.

### No. 4799.

United States District Court
S. D. California, C. D.

Dec. 19, 1945.

©—9

Vernon S. Gray, Los Angeles, Cal., for plaintiff.

Loeb & Loeb, by Herman F. Selvin, and Grant B. Cooper, Los Angeles, Cal., for defendants.

YANKWICH, District Judge.

This is an action for plagiarism. I have read the scenario involved here and the motion picture was run in court. The case presents a question of fact, because the principles which govern it are well established. Some of them I have had occasion to treat in other opinions dealing with various phases of litigation of this type. So I address myself to the solution of the two problems which confront us here.

## I.

### Access.

The first is access. Access means that the person who is charged with pirating another's work saw the first person's work. At times, access presents strange situations.

In Carew v. R.K.O. Radio Pictures, Inc., D.C.Cal.1942, 43 F.Supp. 199, access was claimed through the "humming" of a tune to a person in a cafe. I held that there was no access, and, that there was no similarity between the two musical compositions. In the present case, as in Hirsch v. Paramount Pictures, D.C.Cal.1938, 17 F.Supp. 816 (also published in Library of Congress, Copyright Decisions, 1935-1937, page 158), involving a musical composition—access was admitted in the answers. But that, in itself, does not mean anything if the access was that of a person who had nothing to do with the creation of the "accused" story. The admission of Universal Pictures Company is contained in paragraph II of the answer, which reads: "Referring to paragraph IV of said complaint, answering defendant admits and alleges that on or about March 27, 1941, a manuscript entitled 'Ambitious Lady,' purporting to have been written by Oscar Brodney and Jack Rubin, was sub-

mitted to answering defendant by a motion picture agent, and was returned to said agent on April 15, 1941."

■ The corresponding paragraph in the complaint alleges that the manuscript was submitted by plaintiff's assignors on March 27, 1941, and was delivered to the defendants, on that date, "for the purpose of examination by the defendants, with the view to purchase thereof by defendants and, in the event the defendants did not purchase such literary composition, and motion picture scenario, it would be returned to plaintiff's assignor and remain inviolate in each and every part thereof." But the admission of access by Mr. Bruce Manning, does not, of itself, settle the question of access. In order to deduce, therefrom, access of others who developed the script which was ultimately embodied in the motion picture, it would be necessary to show that, throughout the various transformations which the scenario suffered—the contents of scenario, with which Mr. Manning had become acquainted, were communicated by him to the persons who worked on the final form. Otherwise, they cannot be charged with any knowledge which Manning acquired through the reading of the scenario, after its receipt March 27, and before its return on April 15, 1941.

But we have Manning's undisputed statement that he did not communicate the contents of that scenario either to Mr. Jackson, or to any one else, who worked on the picture. This is not contradicted by anything in the record. On the contrary, the physical evidence and other facts corroborate it: Manning's expression of disapproval of the story; his separation from the company for a long period of time; and, especially, during the period when the final form of this story took shape.

■ Of course, the denial by a person that he did a certain thing need not be accepted at its face value. But when that denial is by the only person who had any knowledge, and there are no other facts from which the communication of such knowledge could be inferred by legitimate, legal inference, it is conclusive. The problem is not novel. It arises many times. And the physical evidence is often the most valuable from the standpoint of the trier of facts.

In Cain v. Universal Pictures Co., D.C. Cal.1942, 47 F.Supp. 1013, 1016 (also published in Bulletin 24 of Copyright Decisions, Library of Congress, page 112), we were dealing with a story actually purchased and paid for, from which only the title was used. Mr. James Cain claimed that the sequence known as "the church sequence" was lifted from this book "Serenade". Taylor, the writer, and Stahl, the director, testified that they did not know of the book and that the sequence of incidents in the church came to Taylor, from his own recollection of regular church attendance and service as an altar boy in a Catholic Church, in his youth. The producer of the picture testified that the scenes had been in a prior script submitted by another writer.

In the present case, if we start with the plaintiff's own date, given in the complaint as March 27, 1941, on which he says he submitted the story to Manning, the evidence before the court shows that, on March 21, 1941, there existed an embryonic scenario of only a page and a half, entitled "His Butler's Sister," in which the idea of a girl gaining admission to a home through the circumstance that her brother was a butler is used as the means of developing a romance between the girl and a successful businessman. A carbon copy of this scenario was introduced into evidence. It bears the date of March 21, 1941. Significant also is a news item of the same date by Louella O. Parsons, which, in the form of "gossip," states that a certain director "will be switched to the Bruce Manning-Felix Jackson opus, 'His Butler's Sister.'" From that date on, we have at least five scenarios antedating March 27, 1941.

On March 22, we have a further treatment of the theme. There the girl is spoken of as "Caroline," while in the scenario, Exhibit C, the girl is referred to as "C. L.," the name of the actress it was intended to star in the picture; and the hero as "C. B." —Charles Boyer; the brother is given the name "Phillip"; and we have as the hero a completely Americanized Frenchman named "François." The means of introduction is the brother, who is the butler.

On March 25, we have another amplification of the scenario, and Caroline is made to take part in a night court scene. This is done by means of a "fade-in."

On March 26, we have an entire recasting of the story, which now consists of six pages, single-space. Here the girl's name is retained as Caroline; the butler's name is Phillip, and the girl is a model, showgirl and dancer, who has to serve as a maid in the home where her brother is a butler, and René Gallatin is the master. The French element is maintained, although they use the name Gallatin—the famous American of French descent, who played so important a part in the early days of our national life.

On the same date, suggestions are made for development and additional scenes, as to each of the characters—Caroline, François, and many others.

There are other scenarios, which need not be referred to. But it is significant that up to now the original story has been transmuted into various forms. And when we come to Exhibit I, which is dated March 28, the day after submission, no change is made except that some one suggests that René could be made a more conservative type of man, not a man-about-town; that he might be made to bring in the French branch of the family, a man whose parents died when he was 22; his mother's brother brought him over to America and put him in charge of some of the family estates. (This could be either "oil" or "Baldwin locomotives" or "shipyards.")

The first five outlines preceded the date of submission. They developed an idea which antedated the submission of the story.

Exhibits J and K are complete scenarios. J is dated April 1, and in it the cast of characters is changed. A Russian prince is brought in now, whom they call Peter Kavani. The night court scene is retained.

Exhibit K, which is the only one which the two writers, Mrs. Reinhardt and Mr. Hoffenstein, ever saw, is a complete story, in which the names "Caroline" and "Phillip" are still maintained. They are descended from a very fine family, but become poor.

Now the man has the habits of a gentleman, without a gentleman's income. The woman has the habits of a lady, without the means of satisfying them.

After that we have the three scripts out of which grew the final script, which is Exhibit P.

The writers agree that Mr. Jackson consulted with them, and that they developed various stories. The consultations, at times, were very informal—at lunchtime, or they would write suggestions as a memorandum. They said that all they took from the story "K" was the idea of a maid coming into the master's house through the intervention of her brother—the butler. And that the remainder of it was their original story constructed to fit the personality of Deanna Durbin.

The only means of access by Hoffenstein or Mrs. Reinhardt would have been through Jackson, because Manning was not working on the story.

What is there to contradict Manning's statement that he never told Jackson the contents of the scenario which he had read? We cannot, by association, charge a person with a tort, merely because he worked with another in days past. And that is about the only thing, as I gather from the plaintiff's argument, upon which he grounds his contention that there was access.

It is true that the three,—Reinhardt, Hoffenstein and Jackson,—had worked together in the past. But this is not sufficient—in the face of a denial by all that Jackson knew the contents of plaintiff's story.

It is, therefore, quite evident to me that there is no access here. It is true that one writer connected with the company had read the scenario, but that writer had absolutely nothing to do with the creation of the story produced as it took final shape. On the contrary, the main idea of the butler's sister had been conceived by him and Jackson before this scenario was submitted, and had taken the shape of at least six tentative drafts before the two final drafts, also written subsequent to the date of delivery of the manuscript,—came into being.

After that, the matter was dropped. And when the thread was taken up again the only form of the story which was given to the writers was the story known as Exhibit K, which bears date of April 12, 1941. The work on the new form of the story began in January 1943, nearly two years later.

I do not think that access can be deduced from the facts thus established. We cannot assume, that because two men were associated in writing for a motion picture company, the knowledge of one became the knowledge of the other, when both of them deny that the contents of the scenario were ever communicated. Of course, if Mr. Manning had produced the same picture later, in 1943, or had collaborated on its development, his denial that he communicated the ideas behind the story to others who were working on the picture could be disregarded. And we could then say that human frailty is such that, although the denial might be made in good faith, nevertheless, he could not clear his mind entirely of the remembrance of the past story. · The distinguished French novelist Marcel Proust built a great novel on "Remembrances of Things Past." But Manning did not collaborate on the final form of the story, and he had absolutely nothing to do with its production in any capacity whatsoever. All there is in the case to show access is the fact that Manning read the manuscript. And there is nothing more on which to base an inference that Jackson, or any one else through Jackson, received the information as to the contents of the submitted scenario which Manning had in 1941.

As I believe that these cases should be decided on the merits, and not on a mere technical finding upon the question of access, I assume access, and proceed to discuss the merits of the case. ·

## II.

### The Elements of Similarity.

In the Hirsch case, supra, the evidence of access—the "humming" of a song to a writer at Henry's, a then famous Hollywood restaurant—was rather flimsy. Nevertheless, the case was decided on the basis of dissimilarity of the compositions.

In Carew v. R.K.O. Radio Pictures, Inc., D.C.Cal. 1942, 43 F.Supp. 199, the evidence of access was also very slight. Yet I proceeded to decide the case upon the merits, and found that there was no similarity between the two songs.

So we come to the main proposition: Is there such similarity in the theme, in the development of the theme, and the means used, the climax of the story, and what might be called the triumph—the dénouement, as the French call it, to carry the impression to me, not as a judge, not as a person who may be more or less familiar with literature, but as an average person who reads a scenario and sees a play,—that they are the same? This is the criterion which the courts have adopted. We find that, in discussing the question of similarity, courts resort to their own knowledge of literature in order to make a comparison. In an English case—Chatterton v. Cave, 3 App.Cas. 483, at page 501, the judge said: "An idea may be taken from a drama and used in forming another, without the representation of the second being a representation of any part of the first. For example, I have no doubt that Sheridan, in composing 'The Critic,' took the idea from 'The Rehearsal'; but I think it would be an abuse of language to say that those who represent 'The Critic' represent 'The Rehearsal' or any part thereof; and if it were left to me to find the fact, I should, without hesitation, find that they did not."

This is an almost classical statement, which has been quoted often. It was quoted with approval in Eichel v. Marcin, D.C. N.Y. 1913, 241 F. 404. That case involved a claimed similarity between two stories: "Cheating Cheaters" and "Wedding Presents," "crook" dramas of the type rather common at the time when the opinion was written, in 1913.

My opinion in Echevarria v. Warner Bros. Pictures, Inc., D.C.Cal. 1935, 12 F.Supp. 632, 634, contains a summary of the criteria used in determining similarity. A statement at the beginning of that opinion is especially applicable here, because here as there we are dealing with an uncopyrighted composition: "The right of a

person in literary work exists at common law, and may be protected irrespective of copyright. The law of copyright has merely provided an additional method whereby an author by registering his work establishes his right as of the date of registration with the Register of Copyrights, so that he may be in a position to show by the official registration the date of the publication of his original composition. The right which the copyright law protects differs in no respect from any other form of personal property in the protection which the common law throws about it. Its basis is the right to everyone to the fruit of his labor."

Mere similarity of theme is not in itself sufficient to establish plagiarism. To use the language in the opinion just referred to:

"The dramatic situations which form the stuff of drama are few. The entire dramatic literature of the world can be reduced to some three dozen situations. In fact, an ingenious Frenchman has written a book in which, after analyzing the entire dramatic literature from the time of the Greek and Hindu dramas to the present time, he concludes that all these dramatic works present, in variant form, the few situations which he has analyzed. A rule, therefore, which would place originality not in the manner of treatment of a theme, but in the theme, would place the 'hack writer' upon the same footing with the genius. And so the law, realistic in this respect, places originality where it belongs. * * * Where plays are dissimilar in thought, character, text, and situations, there can be no infringement merely because both made use of an old situation. This is particularly true where the points of essential difference so far outnumber the points of similarity that 'it is difficult to understand how anyone could persuade himself that the one was borrowed from the other.' * * *

"Even though there are characters in both plays having similarity and some instances of similar phraseology, when the theory of the two plays is entirely different, there is no infringement. * * * The connection between the two works must be obvious to the ordinary reader or observer. * * * Protection is extended to the means of expression, not to the plot. * * *

"A person may take the same fundamental idea as that of another work, and if in developing it the incidents in which it is developed are substantially different, if the idea is worked out on different lines, so that the two works bear no real resemblance to each other, there will be no infringement."

An English case which deals with the problem is Bagge v. Miller, MacGillivaray, Copyright Cases, page 178, in which the works involved the fundamental idea of compulsory truth-telling by means of a bet. The court held that that idea was stock, and that there could be no infringement of it.

The French use a very expressive phrase in dramatic literature: "scènes à faire"; that is, scenes which "must" be done. For instance, the "scène à faire" in the present script is called for by the scene in which the girl burned her hand on a cigarette. Something had to be done with that burn, and the author uses it as a means of identification. In an old play in which Adolphe Menjou appeared, in the days before talking pictures, he came in, spilled some red ink; then took a handkerchief and wiped the ink off his hand with it. That was the beginning. Ultimately there had to be a scene explaining the red spot.

So in all dramatic works we find that situations which are identical call for scenes which are similar. In Eichel v. Marcin, supra, the court uses this language [241 F. 411]: "The resemblance between the two dramatic compositions, I am of the opinion, are minor instances and are not important. The copyright cannot protect the fundamental plot, which is common property, as was pointed out above, long before the story was written. It will, of course, protect the author, who adds elements of literary value to the old plot; but it will not prohibit the presentation by someone else of the same old plot without the particular embellishments."

Underhill v. Belasco, D.C.N.Y.1918, 254 F. 838, presented the question of similarity between a play produced by David Belasco under the title "Marie Odile," and

the Spanish play written by Gregorio Martinez Sierra, called "The Cradle Song," translated by Underhill. Both plays dealt with a community of Catholic sisters. And it was claimed that "Marie Odile" plagiarized the printed play. Judge Mayer wrote a very interesting opinion, in which he pointed out that once the locale of a story was placed in a Catholic convent, it was necessary to bring about the very situations which both of them contained. He pointed to the fact that, in order to bring a child into a convent, it was necessary that the situation be postulated in the manner in which it was done in the play,—and that a soldier be the man to enter the convent in wartime, for not even a soldier could enter it at any other time.

Perhaps the leading case which deals with a situation of this type is Simonton v. Gordon, D.C.N.Y.1924, 297 F. 625, 627. The play known as "White Cargo" was alleged to have been plagiarized from the book called "Hell's Playground." Both were dealing with the idea of the deterioration of the white man under African environment. In order to carry out the idea it was necessary to have the usual white man, who "goes to the dogs" because of his association with Africans. Use had to be made of the conventional stock figures of traders, missionaries, and black servants with the prevailing customs. Both of them contained the same situation. Judge Winslow wrote: "Probably one might search a long while and not find a play that has not something in it that is to be found in some previous publication, either in drama or fiction or poetry. The problem of the court is to determine what the fundamental scene is and to see whether it has been appropriated."

In Echevarria v. Warner Bros. Pictures, Inc., supra, a Filipino writer had composed a scenario to which he gave a Latin name: "Nulias Filias." He published it in a magazine known as the "Scenario Bulletin Review," and he claimed that it was plagiarized in a Warner Bros.' play called "Across the Pacific." I pointed to the fact that any play which dealt with the Philippines at the time of the American occupation had, perforce, to bring in Aguinaldo, the Filipino leader, and General Funston; that they are historical figures so connected with the event that it would be impossible to write a story of the Spanish-American war and its sequel without having the two protagonists in it. The writer claimed that this was the greatest similarity between the two. The answer was: "If originality can be claimed in opposing Aguinaldo to Funston, as the plaintiff claimed in open court, then all the novels, short stories, and dramas written about the Civil War, opposing Grant and Lee, might never have been written after the first one, because the author of the first one could have claimed exclusive right to the idea."

And the conclusion was expressed that, aside from this similarity, which placed the two national heroes in conflict, there was no other similarity between the two works.

In sum, the first fundamental to be deduced from these cases is, that once we deal with a particular situation which is not original with any one, it calls for certain sequences in the methods of treatment, which cannot be avoided, because they are, in the very nature of the development of the theme, and are used by every writer who knows his craft.

### III.

#### No Literary Property in Locale.

There is one other principle to be referred to: Locale is not the subject of copyright protection, or to common law protection as literary property. This has already been illustrated by the Underhill case, supra, in which it was ruled that placing a story in a convent implied no originality.

In an English case, Vining v. Evett, MacGillivaray Copyright Cases 1910–1916, page 188, similarity was claimed between two stories which turned around a band of brigands with a lair in the mountains. The court held that neither the placing of the story in the mountains nor choosing as the actors or the participants, a band of brigands, had elements of originality which prevented others from using the same idea.

The identical question was presented to me in 1928, when I was judge of the Superior Court.

The case to which I refer is William F. James and Dorothea K. Martin, plaintiffs, v. Universal Pictures Corporation, et al., defendants, No. 258658, Superior Court of Los Angeles County, the opinion in which was published in the Los Angeles Journal, December 8, 1928.

In that case it was claimed that the motion picture play entitled "The Symphony" or "Jazz Mad," was taken from an unpublished scenario written by the plaintiff, entitled "Echo of the Hills."

The story was not copyrighted. I wrote:

"Whether the law is protecting this common law right against piracy (appropriation) or whether the protection is against copying under the copyright law, the same principles, on the whole, govern the determination of the question whether there has or has not been use and appropriation of the work of another. The general rule applicable to dramatic productions is thus stated in 13 Corpus Juris, 1145:

" 'The part taken must be material, and there must be a substantial identity, pro tanto, with the original composition in order to constitute piracy, and that identity must be due to copying and not to mere coincidence such as may exist even in the case of works independently produced. Where the two productions produced the impression on spectators that they were substantially the same, one will be held to be a colorable imitation of the other. But a substantial similarity, founded on coincidence, or the use of old or stock situations, or common sources, and not the result of piracy, direct or indirect, is insufficient to establish infringement; nor is the taking of a general idea or scheme sufficient. The common stock of dramatic ideas cannot be exclusively appropriated by anyone. Originality in dealing with incidents familiar in life or fiction lies in the association and grouping of those incidents in such a manner that the work under consideration presents a new conception or a novel arrangement of events.' * * *

"By a process of simplification, or dissection, the chief witness for the plaintiff, declared the theme (which he defined as 'the underlying thought or basic idea') of both the story and the picture to be: Genius driven down by force of circumstances —elevated from depths of mental distress by the psychotherapeutic influence of music. Such a process of simplification would place 'Anna Karenina' on the same footing with 'Three Weeks.' For, ultimately, they are both stories of adultery.

"In a dramatic work both the plot (including in that word the idea and the arrangement of the incidents) and the dialogue and working out of the play must be regarded in order to see whether one play is reproduction of the other or of a substantial part of it, and regard must also be had to the extent to which both plays include stock incidents." (Rees v. Melville, McGillivaray Copyright Cases. 1910–1916, page 168.)

I then referred to the fact that this idea was not new; that, in fact, it was used in two American plays, and formed the story for an opera by Gaetano Donizetti in the libretto by Rossi. Referring to the claim that the use of the Hollywood Bowl, or a similar place, as the scene for the restoration of a man's sanity, could not be the subject of appropriation, the opinion stated: "A claim of authorship to such an idea can no more be successfully asserted than to the idea building a dramatic story around a bandit's lair in the mountains. So closely has the very name of the Hollywood Bowl been associated with symphonic music ('The Symphony Under the Stars'), that it can be readily seen (in fact, it seems almost obvious), how it would thrust itself upon the mind of producers as a locale for a story dealing (as does the picture) with a symphony. The idea of such a use would more readily occur, under such circumstances, then in conjunction with a story (like the plaintiffs') involving an opera, as the Hollywood Bowl has but rarely been used for opera productions."

In Cain v. Universal Pictures Co., D.C. Cal., 1942, 47 F.Supp. 1013, 1017, Mr. James Cain, claimed, as already stated, that the

church sequence in a motion picture was borrowed from his book "Serenade." Although there was a great deal of difference between the two narratives, the author claimed that placing the two persons in a church was an original idea with him, so as to show appropriation. This claim was answered:

"I cannot understand 'how anyone could persuade himself that the one was borrowed from the other'. * * *

"It is not claimed that the choice of the church as a refuge in storm lends itself to the assertion of copyrightable originality. Houses of worship have been asylums since their very beginning. At one time, the legal privilege of sanctuary attached to churches. And he who entered one of them acquired immunity against the law.

"The other small details, on which stress is laid, such as the playing of the piano, the prayer, the hunger motive, as it called, are inherent in the situation itself. They are what the French call 'scènes à faire'. Once having placed two persons in a church during a big storm, it was inevitable that the incidents like these and others which are, necessarily, associated with such a situation should force themselves upon the writer in developing the theme. Courts have held repeatedly that such similarities and incidental details necessary to the environment or setting of an action are not the material of which copyrightable originality consists."

In applying these principles to the case at bar, we start with the last statement first, because Mr. Harry Edwards, the plaintiff's expert witness, when asked by the court what he considered the originality of the story to be, stated that it was the use of the "butlers' ball." If we take this as indicative of the beliefs of plaintiff, the conclusion is inevitable, under the decisions just quoted, that it is not of the type which is subject to legal protection against appropriation by others. From time immemorial, balls, whether given by butlers or by the "gentry," have been used as a means of weaving romance—including the famous English ball given before the Battle of Waterloo.

If we consider the interrelation between the three persons: the master of the house, the butler, and the butler's sister, we find but a variant of the theme which runs through much dramatic literature—of the maid marrying the master of the house, after being introduced, either legitimately or surreptitiously. I refer to the fact that one of the oldest English novelists, Samuel Richardson, in "Pamela," wrote a novel which had this theme. The idea of using these three personages was in the minds of the employees of the defendant long before any of them knew of the plaintiff's story.

So the upshot of the matter is this: Neither the choice of characters nor the scene which motivated the choice—romance between a girl introduced into a master's house, and the master—nor the use of the butler's ball in the dénouement of the story, are ideas, or concepts, to which originality attaches. They are the common stock of literary composition—"clichés"—to which no one can claim literary ownership.

It would be very easy for one who has lived with a story, or with an idea, to so "sublimate" it as to make a very plausible comparison between the two. All one would have to do is to reduce it to an abstraction, as did the writer in James v. Universal, supra. One could take a fundamental idea—such as the curative power of music, the power to restore a man to sanity by hearing his music played—and claim that any other story which restores a person to sanity, or restores his eyesight, may be considered an infringement.

But the law of dramatic plagiarism does not sanction such claims. Dramatic situations are few. It is common knowledge that many of Shakespeare's plots were chosen from novellettas—short stories current in Italy at the time. But he took an ordinary love story, and made the thing of great beauty which is Romeo and Juliet. He took a common story of accession to a throne through murder, from Scottish annals, and gave us the brilliant tragedy of Macbeth. It would be daring, indeed, to deny originality to that great creator.

Originality consists in the development of a theme. And in determining

whether there is originality we are not governed by the opinion of the author, or by that of experts. See Simonton v. Gordon, D.C.N.Y.1924, 297 F. 625, 626.

Even when admitting such testimony, as was done in this case, it is merely an aid to the court. The court must determine whether similarity exists. Judge Winslow wrote in Simonton v. Gordon, supra: "The book and manuscript of the play are before the court, and, in addition thereto, there are voluminous affidavits for and against the motion, besides analyses of both productions submitted by complainant and defendants. The complainant submits the opinions of so-called experts as to the alleged infringement. Such conclusions of experts are useful only in directing the court's attention to alleged similarities in theme and atmosphere, or as to the supposed identity of characters appearing in the book and the play. These opinions cannot, however, be substituted for the court's opinion."

The court's opinion must be arrived at after a comparison; not by reducing the play to an abstraction, but by weighing the work in the light of the final composition and its manifest developments.

## IV.

### The Dissimilarities in Theme and Treatment.

█ If we consider the theme before us, there may be some similarity, a desire to achieve fame. In the scenario the desire is to achieve literary fame; in the picture the desire is to attain fame as a singer. The very difference between the two called for entirely dissimilar treatments.

In the scenario the young woman had written a book which she wished to produce as a motion picture. She sought to meet the producer. In the picture the young woman had a good voice, and her object was to have a noted composer hear her sing, with the idea of having him choose her for some part in a musical show which he might write. So there is a difference even in that.

This dissimilarity called for different development. The development in the story is through the active participation of the brother. The brother is a willing partner, from the beginning to the end. He is ready to help in all honorable ways; some of them not so honorable. He is willing to assist his sister in having the manuscript placed before this great producer. In the second, the butler is negative. He does not even recognize this "kid" sister. Even after she identifies herself, he tries to avoid having her meet his employer—the composer. And, after he learns of her talent, his thought is not to promote her through the composer, but to become her manager and exploit her through a producer commercially connected with shows.

The means are different. The scenario resorts to all kinds of fortuitous and improbable situations to bring to the employer the knowledge that the butler's sister is the famous Hazel Forbes who had written the scenario which he had surreptitiously placed on his desk. You cannot visualize the story except through the language used. I would say that there is a "smirking smartness" in the language and in the attitude of the butler used in the plaintiff's scenario. The butler, in the play, is a man interested in his own welfare, who does nothing, except indirectly, to help the sister achieve the fame she desires. The scenario resorts to all kinds of artificial means and disguises, some of which would not be tolerated in a comedy of manners. Witness the burning of the hand as a means of subsequent identification, and the like.

The play, from the very first meeting of the sister, as she was vacuuming under the piano, to the very climax, is an unsophisticated story of a man who is attracted by a beautiful girl, who also happens to be a person whose voice he had heard once, when he thought it was coming over the radio.

In the scenario the love interest does not happen until the end. In fact, the girl tells him, "I know you are in love with me." All the time he was trying to find the author of the story, and he was interested in the girl, whom he had taken out at various times, because she was a good companion. In the scenario love follows a natural sequence; that is, as much as you can call anything so romantic natural. There is

no love declaration or a lovers' spat, such as is introduced by the party given by the butlers at the Russian inn. Even what one might call the "heroine's triumph" is different. The scenario has an anticlimax, from the standpoint of the hero, the heroine, and the butler. After the love declaration, which is made by the girl, the hero says:

" 'How did you know?'

" 'Uncle Jeff told me,' she confesses.

"Crandall pretends to be angry. 'Oh, so along with other things,' he exclaims, 'he betrays my confidence! Well, he's definitely fired now.'

"Outside, Uncle Jeff gets sick again.

"Inside the room, Crandall takes Mary in his arms. He seems at a loss for words. Suddenly he finds his tongue. 'Darn it all, Mary,' he says impulsively, 'the price on your story has gone so high, I think it'll be cheaper to marry you.'

"They look into each other's eyes for a moment. Then they kiss.

"Outside, Uncle Jeff straightens up from the keyhole. There is a broad grin on his face. He fishes a small card from his pocket and looks at it. It reads: 'Geoffrey Bates, Vice President in Charge.' With a pencil, he writes the word 'Uncle' in front of his name. He holds it at arm's length and looks as it appraisingly. He is not quite satisfied. He scratches out the word 'Vice.'

"The card now reads 'Uncle Geoffrey Bates, President in Charge.' He nods in satisfaction.

" 'I wonder,' he muses aloud, 'if there's any advancement when you become president.' "

To me this is an anticlimax, and a comedy note on which a romantic story should never end. But it points to the difference between the two works: The producer in the scenario was chiefly interested in the play, so that even at the moment when he admits his love for the girl, he talks about the play, while the uncle is interested in retaining his position. And the story ends upon a note of comedy by bringing out the fact that the man who pretended to be wealthy was, in reality, only a butler.

The emphasis in the picture is on love triumphant: Two people carried away by this force, this uncontrollable power.

The song is merely a means. And as the hero makes his way towards the girl in the audience, and she approaches him, it is not only a natural climax, but the only one which suits a romantic story. Otherwise put, there is "love triumphant." In the play music has been the means. The business feature, or the musical fame, has been forgotten, to be taken up only as an incident with which the audience is not concerned. In the story the three protagonists are talking business even after the avowal of love.

In what precedes, I have tried to analyze the two works and to contrast them. I do not seek to minimize the value of the scenario as a work of literature, or its picturization possibilities.

The conclusion of the analysis is that the only similarity which exists is in the theme—if we make an abstraction of the theme, and call it a "desire to achieve". In one case it is literary fame; in the other, musical fame; in each case through a certain, particular person. But there the similarity ends. And from there on the means used in the development of the characters introduced, the personalities involved, the manner of reaching the climax, the manner of achieving the triumph of the girl, are so different that I cannot see how any one who reads the story and sees the picture, *without pre-judgment,* can say that there is anything of importance in one which is carried over into the other.

The only matters that remain are the use of the three personalities—master, butler, and butler's sister, and of the butler's ball —none of which could be appropriated by anyone under the principles already stated. In view of this conclusion, we need not discuss the question of damages.

Judgment will be for the defendants.