## MAXWELL v. GOODWIN.

### (Circuit Court, N. D. Illinois. April 26, 1899.)

1. **LITERARY PROPERTY—DRAMATIC COMPOSITIONS—TEST OF INFRINGEMENT.**

   The weight of American authority sustains an author's right of property in his dramatic compositions aside from that given by copyright statutes, and establishes the test of piracy of such a composition as being, not whether it is copied in the language of the original, but whether it is, in substance, reproduced without authority, either in whole or in a material part.

2. **SAME—ACTION FOR PIRACY—POWER OF COURT TO SET ASIDE VERDICT.**

   The rule held in patent causes at law that issues as to infringement and identity should be submitted to a jury applies in actions for infringement or piracy of dramatic compositions, but under the same rule the court is authorized to set aside a verdict unsatisfactory to itself as against the weight of evidence.

On motion to set aside the verdict, which found the defendant guilty, and assessed the damages of the plaintiff at $10,000, in an action charging piracy of an unpublished play called "Congress," of which plaintiff is the author.

W. J. Strong, for plaintiff.

W. K. Lowry and F. F. Reed, for defendant.

SEAMAN, District Judge. Interesting questions of law were presented at the trial, which affect the right of action independent of any contention on the facts, and are reargued on this motion with thoroughness and ability. The propositions submitted on behalf of the defendant are not without force. The existence of a dramatic or stage right at common law, upon which the plaintiff's cause of action must rest, is controverted by the English precedents cited, and support is found in American authorities as well for the further

contention that there is no inherent property right in ideas, sentiments, or creations of the imagination expressed by an author, apart either from the manuscript in which they are contained, or "the concrete form which he has given them, and the language in which he has clothed them." Stowe v. Thomas, Fed. Cas. No. 13,514. On the other hand, American decisions have in notable instances upheld dramatic rights, not resting on the copyright statutes, but as literary property at common law; and there is a line of the same authority for the test of piracy which was given in the general instructions to the jury in the case at bar, namely:

"As the owner of material possessions may assert his rights wherever or in whatever disguise his property is found, so the author of a literary composition may claim it as his own in whatever language or form of words it can be identified as his production. The true test of piracy, then, is not whether a composition is copied in the same language or the exact words of the original, but whether, in substance, it is reproduced; not whether the whole, but a material part, is taken. * * * The controlling question is whether the substance of the work is taken without authority."

If either of the fundamental propositions for which the defendant contends is sustained, it is clear that this instruction was erroneous, and that there was no question of fact for the jury. On reviewing the authorities cited, I conclude that the instruction is in accord with the weight and trend of decisions in this country, and that doubt whether the rule so held is well founded at common law should not be resolved against the verdict, if it were otherwise satisfactory, as exceptions are well preserved for final settlement on writ of error. This contingency, however, is not presented here, as I am of opinion, aside from these questions, that the verdict is not supported by the evidence, and that the tests of piracy, as further defined in the instructions, were clearly disregarded or misapprehended by the jury.

Applying the rule held in patent causes at law, that issues of infringement and identity must be passed upon by the jury, it was deemed proper, if not necessary, to so submit the issue of infringement or piracy in this case. Under the same rule the court is authorized "to set aside a verdict unsatisfactory to itself as against the weight of evidence." Bischoff v. Wethered, 9 Wall. 812, 814; Coupe v. Royer, 155 U. S. 578, 15 Sup. Ct. 199. But I do not feel justified, under the undisputed testimony here, to rest decision upon that view alone. The instructions were specific that, unless material portions of the play of "Congress," which were found to be the intellectual production of the plaintiff, were in fact and manifestly reproduced and copied in the defendant's play "Ambition," the charge of piracy was not sustained. The jury were further instructed, in reference to alleged resemblances between the two plays in general feature,—such as scenes laid in Washington, and relating to congressional legislation, honest and dishonest senators or congressmen beset by temptation at the hands of a sugar trust, love scenes complicating the plot, secretaries, negro servants, dudes, and other accessories of the modern drama,—that they were, with the general theme or story showing the triumph of an honest legislator over corrupt influences, common subjects, for imagination, at least, in which the plaintiff possessed no right of literary property; that, unless identity was found

in the matter and expression showing that one was copied from the other substantially and in material parts, although not in the exact language or form, there was no piracy, and the defendant was not liable in this action. It is probable that the distinctions called for were imperfectly stated, and not well understood by the jury, as the boundaries are not so well marked, at best, as to be within ready observance. There can, however, be no identity of the production, on which to establish a right of action at common law, short of the test indicated in this instruction; and, so considered, I find no escape from the conclusion that the evidence is insufficient to sustain the verdict, whether measured as a whole or taken alone on the testimony presented by the plaintiff.

1. When the two plays are compared, read either as an entire production or in detail in any parts or form, I can find no copying or imitation in plot, scene, dialogue, sentiment, characters, or dramatic situations, and no similarity, aside from the general features and subjects which are pointed out in the instructions as clearly open to common use,—resemblances which may naturally occur when congressional life in Washington is the theme, and certainly there is nothing uncommon in that subject for story or drama. Indeed, there is marked dissimilarity in the portrayal of all the characters and in thought, treatment, and expression, both in detail and throughout the plays. In the one the dominant idea is apparent in the presentation of a political issue, while the other carefully avoids any such subject; and, briefly stated, no intellectual creation of the one reappears in the other in any form. The plaintiff, testifying as an expert, specified numerous points in which resemblance was asserted, but neither in his specifications nor in any point suggested by counsel can I recall one which comes within the definition of an intellectual creation, or one which is not either inconsequential, or of the class of common subjects adverted to in the instructions. Aside from the fact that Mr. Maxwell submitted his play to the defendant in the spring of 1895, with at least an opportunity to read and glean from it, and that the latter presented the new play of "Ambition" in the following fall season, with scenes laid in Washington, and relating to congress, no discriminating reader would infer a common authorship, or even that the one received inspiration from the other in material matter. In the light of this fact, and without other explanation, the utmost of his inference or suspicion would be that the defendant had taken from the former the suggestion of founding a plot on congressional life in Washington, including the machinations of a "sugar trust," and had thereupon committed it to Mr. Carleton to hasten its production in a new play to anticipate the plaintiff's creation,—an assumed course, which totally disregards the cumulative testimony on the part of the defense as to the time and circumstances of the preparation of "Ambition," and which would, in the extreme view, violate ethics, but no common-law rights of property.

2. This possible inference from the circumstance last referred to brings the inquiry to the testimony relating to the actual origin of the defendant's play, which would remain as a pure question of fact if the plays were identical in substance. The plaintiff commenced

writing the play of "Congress," as his first effort in that line, in the fall of 1894, completing it three or four months later. In the spring of 1895 he left the manuscript with the defendant, who was then in Chicago, having no previous acquaintance, but hoping it might prove acceptable. The manuscript was returned within a week, and the defendant testifies that he neither read nor opened it, and had no information of the contents, aside from a brief statement which the plaintiff gave in their conversations. On the other hand, the play of "Ambition" was written for the defendant by Mr. Carleton, under a contract in writing made September 29, 1893, which is clearly authenticated, and refers to the "scenario" of the proposed play as submitted therewith. Mr. Carleton testifies that he conceived and outlined the play during several months preceding this contract, and had prepared what is called the "scenario" of 20 or more pages, showing plot, naming all the characters, and giving parts of the dialogue, substantially as the play was afterwards written; and this was delivered when the contract was entered into. He is confirmed in these particulars by the testimony of Mrs. Sargensdorf, his secretary, and that of the defendant and his manager, Mr. Appleton. The completion was delayed by circumstances which are explained; but Mr. Carleton testifies that it was originally finished in the fall of 1894, when he read it to Mr. Frohman, a theatrical manager, for criticism, after witnessing a new play just introduced called "The Bauble Shop," in which the principal character was a prime minister; that he had adopted for his hero the position of secretary of state, and it was deemed best, to avoid any apparent coincidence, to transform him into a senator and chairman of the committee on foreign relations. With this, and changes in form, which are named, he states that the play was rewritten, and was delivered to the defendant in September, 1895, on his return from Europe; and that the plot and all substantial features remained unchanged. This testimony is corroborated by Mr. Frohman, who refers to circumstances by which the time is fixed in his recollection. Both Mr. Carleton and Mr. Goodwin testify that no thought or suggestion was taken from the plaintiff's play, nor was any knowledge of its existence communicated to the former, nor suggestions made by the latter in any respect, at any time, as to the plot, characters, incidents, changes, or composition. The cumulative testimony referred to is unimpeached and uncontradicted. Unless it is entirely rejected, there is no room for inference that the play of "Ambition," as produced, was founded in the general plot or characters upon the plaintiff's production. And, if the testimony is credited, it establishes the complete priority of the defendant's play in conception and development; and with credit only in particulars where Mr. Carleton and the defendant are corroborated by circumstances and by other witnesses, priority is established in all matters material to this controversy. Therefore, in either aspect of the testimony as indicated, the verdict must be set aside. An order will be entered accordingly, and a new trial awarded.