**COLUMBIA PICTURES CORPORATION,**
a corporation, Plaintiff,

v.

**NATIONAL BROADCASTING CO.,**
Inc., Defendant.

**No. 16876.**

United States District Court
S. D. California, Central Division.

Dec. 9, 1955.

Mitchell, Silberberg & Knupp, Peery Price, and George Benedict, Jr., Los Angeles, Cal., for plaintiff.

O'Melveny & Myers, W. B. Carman, and Richard R. St. Johns, Los Angeles, Cal., for defendant.

JAMES M. CARTER, District Judge.

Like Loew's Incorporated, v. Columbia Broadcasting System, Inc., D.C., 131 F. Supp. 165, now on appeal, this case represents another collision between the economic interests of the motion picture industry and the youthful and growing television industry. Since in this case we hold for the defendant, and the case is therefore the reverse or counterpart of Loew's Incorporated, v. Columbia Broadcasting System, Inc., supra, we had hoped to be able to write at least a short opinion. The press of other work and the desire to speed this case on its way to the Appellate Court, prevents our so doing. These few remarks are therefore intended to assist counsel in the preparation of findings of fact, conclusions of law and judgment.

We hold for the defendant on the issues raised by the first and second count. The third count has been dismissed by stipulation.

### Comment

Dr. Smith's extended testimony, like Dr. Baxter's in Loew's Incorporated, v. Columbia Broadcasting System, Inc., is informative and captivating, but most of it is beside the point. Its only impact in the case at bar could be on the question of whether the television showing of "From Here to Obscurity" is a true burlesque. How that determination aids us in a solution in this case is difficult to see.

We realize we are working in a new field of law, trying to decide particularly what T.V. may *take* from motion pictures for its shorter productions, and what it *may not take*. In Loew's, Incorporated, v. Columbia Broadcasting System, Inc., we stated you cannot take substantially all of a copyrighted work and defend upon the ground that the alleged infringing work was burlesque or the mere conversion of the work from the serious to the comic. We said also, one cannot take a substantial part, and that although difficulty confronts the court in drawing the line, it must be drawn in each case.

It seems clear and was conceded at the trial, that at one end of the spectrum were situations where clearly the burlesque would be plagiarism, e. g. where a defendant took verbatim the dialogue of a copyrighted script and transferred it from a serious vein to a comic one. On the other end of the spectrum, it seems equally clear that where the burlesque took a theme, the locale, or a situation, that there would be no infringement. This would be true because such matters are ordinarily not subject to protection and secondly, because the taking, if any, would not be substantial.

With some hesitation, but with the assurance that there is logic and fairness behind them, as well as general support in the law, we suggest these principles:

(a) When the alleged infringing work is of the same character as the copyrighted work, viz., a serious work with a taking from another serious copyrighted work, then the line is drawn more strictly than when a farce or comedy or burlesque takes from a serious copyrighted work or vice versa.

(b) In historical burlesque a part of the content is used to conjure up, at least the general image, of the original. Some limited taking should be permitted under the doctrine of fair use, in the case of burlesque, to bring about this recalling or conjuring up of the original.

(c) Burlesque may ordinarily take the locale, the theme, the setting, situation and even bare basic plots without infringement, since such matters are ordinarily not protectible.

(d) The doctrine of fair use permits burlesque to go somewhat farther so long as the taking is not substantial. It may take an incident of the copyrighted story, a developed character (subject to the limited right of an author in certain situations, Loew's Incorporated v. Columbia Broadcasting System, Inc., [note 1]) a title (subject to right of protection under unfair competition, Loew's Incorporated, v. Columbia Broadcasting System, Inc., [note 38]) some small part of the development of the story, possibly some small amount of the dialogue.

(e) When burlesque takes more than the matter ordinarily not protected, and referred to above, it runs a calculated risk, that on all the facts involved, a trier of fact may find the taking substantial.

(f) The defense, "I only burlesqued" the copyrighted material is not *per se* a defense. To hold otherwise would seriously jeopardize rights of property in copyrights and investments in such works, and would ultimately seriously damage the prices to be paid to authors for their literary works. A studio with no assurance it could protect an investment in a copyrighted work from infringement by unlimited use through burlesque of the work, would tend to pay less and less for an author's work. Unlimited and unrestrained taking by burlesque could destroy the Copyright Act,

17 U.S.C.A. § 1 et seq., undermine the motion picture industry, the legitimate stage, and reduce the author to his status of 300 years ago,—dependent on the largess of the Prince or Patron.

Some higher court may decide burlesque was a defense per se. I do not choose to do so.

We trust we have not followed the system of Judge Bridlegoose of Rabelais, and stacked plaintiff's papers on one end of the table and defendant's on the other, before determining in whose behalf we would first cast the judicial dice. Actually, this case tests the general principle and the dictum in Loew's Incorporated, v. Columbia Broadcasting System, Inc. It is an excellent companion case for Loew's and we hope that they may stride together through the hazard of judicial review and still remain consistent companions. Unlike Loew's, here there was a taking of only sufficient to cause the viewer to recall and conjure up the original. This is a necessary element of burlesque. As Dr. Baxter stated at the trial of Loew's Incorporated, v. Columbia Broadcasting System, Inc., the defendant has taken a small part and then " '[taken] off into the blue.' " [131 F. Supp. 183.]

Defendant will prepare findings of fact, conclusions of law and judgment within the time provided by the Rules. Defendant will include suitable citation of authority in the conclusions of law.

### Findings of Fact

1. The claim stated in the first count of plaintiff's complaint arises under the laws of the United States relating to and governing copyrights. The claim stated in the second count of plaintiff's complaint is a claim for unfair competition, arises under the laws of the State of California, and is based upon the same transaction as that stated in the first count. The third count of plaintiff's complaint has been heretofore dismissed by order of this court on stipulation of the parties.

2. Plaintiff Columbia Pictures Corporation (hereinafter referred to as "Columbia") is a New York corporation doing business within the Southern District of the State of California. Columbia is engaged in the production and distribution of motion pictures. Defendant National Broadcasting Company, Inc. (hereinafter referred to as "NBC") is a Delaware corporation doing business within the Southern District of the State of California. NBC is engaged in the business of broadcasting and televising and licensing others to broadcast and telecast radio and television programs.

3. Prior to February 26, 1951, one James Jones created and wrote an original novel entitled "From Here To Eternity", which novel in book form was first published on February 26, 1951, with due and proper notice of copyright. Copyright of said novel was duly registered in the name of James Jones with the Register of Copyrights of the United States. On or about March 18, 1951, James Jones consented in writing to Columbia's creating and producing a motion picture based upon said novel and to Columbia's securing in its own name and as its own property the copyright and registration to such motion picture.

4. In the year 1953 Columbia produced a motion picture based upon the James Jones novel, said motion picture being entitled "From Here To Eternity". General release and publication in the United States of said motion picture commenced on September 1, 1953. Columbia published said motion picture with due and proper notice of copyright in the United States and duly registered its claim to the copyright in said motion picture with the Register of Copyrights of the United States. At all times Columbia was and still is the owner of all right, title and interest in and to the copyright of said motion picture.

5. The motion picture "From Here To Eternity" has an exhibition running time of approximately one hour and 40 minutes. Said motion picture was viewed by this Court in the course of the trial herein. Attached hereto as Exhibit A is a summary of the said motion picture.

6. On September 12, 1953, NBC broadcast over a nationwide network of television stations owned by or affiliated with NBC a televised playlet or skit entitled "From Here To Obscurity". In the course of the telecast thereof the said playlet or skit was reproduced on motion picture film by means of kinescopic process. The performance time of the playlet or skit "From Here To Obscurity" was approximately 20 minutes. The kinescope recording of said playlet or skit was viewed by this Court in the course of the trial herein. Attached as Exhibit B is a summary of said playlet or skit.

7. The playlet or skit "From Here To Obscurity" was telecast by NBC without the knowledge or consent of Columbia.

8. The playlet or skit "From Here To Obscurity" was intended to be and was a burlesque of the motion picture "From Here To Eternity". Burlesque is a recognized form of literary art. In a burlesque, a part of the content is used to conjure up at least the general image of the original. This is a necessary element of burlesque. The writer of a burlesque therefore familiarizes himself with the original and uses more or less of the contents of the original in the creation of the burlesque.

9. The writers of the burlesque "From Here To Obscurity" were familiar with the motion picture "From Here To Eternity". There are similarities between the burlesque and the motion picture. The locale is the same. There are similarities in certain of the general settings, in parts of some of the situations and in the use in both the burlesque and the picture of some of the same principal members of the cast of characters, i. e., a private, a sergeant, a dancehall girl, and the private's friend. There is also some similarity between the burlesque and the motion picture in incident, and in some of the details of the development, treatment and expression. All such similarities are the result of the intentional use of the motion picture by the writers of the burlesque in order to accomplish the purposes of a burlesque.

10. Although the burlesque "From Here To Obscurity" uses material appearing in the motion picture "From Here To Eternity", the burlesque is a new, original and different literary work as compared with the motion picture, and possesses new, original and different development, treatment and expression. There is no substantial similarity between said burlesque and said motion picture as to theme, characterizations, general story line, detailed sequence of incidents, dialogue, points of suspense, sub-climax or climax.

11. The use in the burlesque "From Here To Obscurity" of material appearing in the motion picture was of only sufficient material to cause the viewer of the burlesque to recall and conjure up the motion picture, or the novel "From Here To Eternity" upon which said motion picture was based, and thus provide the necessary element of burlesque.

12. The use made in the burlesque "From Here To Obscurity" of such of the material appearing in the motion picture "From Here To Eternity" as was so used, was permissible and does not constitute a taking of a substantial portion of plaintiff's protectible property.

13. The telecast of the burlesque "From Here To Obscurity" was not intended to and did not deceive the general public or any portion thereof into believing that said telecast was a telecast of the motion picture "From Here To Eternity" in whole or in part, or otherwise deceive the public, nor did the defendant's acts in any way confuse, mislead, or misinform the public as to the origin of the burlesque or the true nature or origin of the motion picture, or otherwise, or give the public a false, unfair or damaging impression of the nature or quality of the said motion picture, or wrongfully interfere with or damage the commercial exploitation of said motion picture by Columbia, or malign, libel, or disparage said motion picture. Said telecast did not and will not in any way disparage or detract from said motion picture.

353

## Conclusions of Law

The Court concludes:

1. In all respects as set forth in the foregoing Findings of Fact.

2. This Court has jurisdiction of both counts of this cause. 28 U.S.C. § 1338 (a) and (b).

3. There can be no infringement of copyright unless there has been a taking of a substantial portion of the copyright owner's protectible material. Harold Lloyd Corp. v. Witwer, 9 Cir., 1933, 65 F.2d 1; Kustoff v. Chaplin, 9 Cir., 1941, 120 F.2d 551; Dymow v. Bolton, 2 Cir., 1926, 11 F.2d 690.

4. Some of the material ordinarily appearing in a copyrighted literary or dramatic work is not capable of ownership, is not protectible, and may freely be taken by others without infringing the copyright. Such material includes the following:

(a) *The title*, Oxford Book Co. v. College Entrance Book Co., 2 Cir., 1938, 98 F.2d 688; Arnstein v. Porter, 2 Cir., 1946, 154 F.2d 464, 474, but the title may be protected under principles of unfair competition, Warner Bros. Pictures, Inc., v. Majestic Pictures Corp., 2 Cir., 1934, 70 F.2d 310; Paramore v. Mack Sennett, Inc., D.C.S.D.Cal.1925, 9 F.2d 66;

(b) *The theme*, Nichols v. Universal Pictures Corp., 2 Cir., 1930, 45 F. 2d 119; Roe-Lawton v. Hal E. Roach Studios, D.C.S.D.Cal.1927, 18 F.2d 126; Maxwell v. Goodwin, C.C.Ill.1899, 93 F. 665;

(c) *The locale and settings*, Echevarria v. Warner Bros. Pictures Corp., D.C. S.D.Cal.1935, 12 F.Supp. 632; Schwarz v. Universal Pictures Co., D.C.S.D. Cal.1945, 85 F.Supp. 270; Caruthers v. RKO Radio Pictures, Inc., D.C.S.D.N.Y. 1937, 20 F.Supp. 906;

(d) *The "situations"*, Harold Lloyd Corp. v. Witwer, Echevarria v. Warner Bros. Pictures Corp., Schwarz v. Universal Pictures Co., all supra; Wiren v. Shubert Theatre Corp., D.C.S.D.N.Y. 1933, 5 F.Supp. 358;

(e) *Ordinarily the characters*, Burtis v. Universal Pictures Co., 1953, 40 Cal. 2d 823, 256 P.2d 933; Becker v. Loew's, Inc., 7 Cir., 1943, 133 F.2d 889; Kelley v. Cinema Houses, Ltd., MacGillvray, Copyright Cases 1932–33, at 362, but cf. Nichols v. Universal Pictures Corp., supra, and Warner Bros. Pictures, Inc., v. Columbia Broadcasting System, Inc., D. C.S.D.Cal.1951, 102 F.Supp. 141, 147, affirmed and modified, 9 Cir., 1954, 216 P. 2d 945;

(f) *The ideas*, Dymow v. Bolton; Nichols v. Universal Pictures Corp., Caruthers v. RKO Radio Pictures Inc., all supra, Eichel v. Marcin, D.C.S.D.N.Y. 1913, 241 F. 404;

(g) *Bare basic plots*, Dymow v. Bolton, Wiren v. Shubert Theatre Corp., supra; Gropper v. Warner Bros. Pictures, D.C.S.D.N.Y.1941, 38 F.Supp. 329.

The copyright owner's protectible property consists in the development, treatment and expression given in the copyrighted work to such elements. Dymow v. Bolton, Eichel v. Marcin, Roe-Lawton v. Hal E. Roach Studios, all supra; Rush v. Oursler, D.C.S.D.N.Y.1930, 39 F.2d 468; Weitzenkorn v. Lesser, 1953, 40 Cal.2d 778, 256 P.2d 947; Barsha v. Metro-Goldwyn-Mayer, 1939, 32 Cal.App.2d 556, 90 P.2d 371.

5. The test as to whether a taking of protectible property is a substantial taking is not primarily a quantitative one. The question is one of quality rather than quantity, and is to be determined by the character of the work and the relative value of the material taken. Universal Pictures Co. v. Harold Lloyd Corp., 9 Cir., 1947, 162 F.2d 354; Loew's, Incorporated, v. Columbia Broadcasting System, Inc., D.C.S.D.Cal., 1955, 131 F.Supp. 165. The test as to whether there has been a substantial or any taking of protectible property is to be applied by comparing defendant's work with the protectible portions of plaintiff's work, using the standard of the ordinary observer. Harold Lloyd Corp. v. Witwer, Roe-Lawton v. Hal E. Roach Studios, Weitzenkorn v. Lesser, all su-

pra; Golding v. R.K.O. Radio Pictures, 1950, 35 Cal.2d 690, 221 P.2d 95. Although the Court will dissect a literary production to determine what portion thereof is protectible in applying such test, it will not thereafter examine the protectible portion for the purpose of discovering isolated similarities as to each segment of the whole. Burtis v. Universal Pictures Co., supra; Dymow v. Bolton, supra; Frankel v. Irwin, D.C. S.D.N.Y.1918, 34 F.2d 142; Solomon v. RKO Radio Pictures, D.C.S.D.N.Y.1942, 44 F.Supp. 780.

■■■ 6. Subsequent authors, writers and the general public have the right to use the protectible material in the copyrighted work without liability for infringement if such use is within the limitations of the doctrine of fair use, Loew's, Incorporated, v. Columbia Broadcasting System, Inc., supra, 131 F.Supp. at page 171. In determining whether a use is a fair use the law looks to the character of the two works, the nature and object of the selections made, and the quantity and value of the materials used. The purpose for which the use is made is of major importance, Loew's, Incorporated v. Columbia Broadcasting System, Inc., supra, 131 F.Supp. at page 176. The amount of material, both quantitatively and qualitatively, which may be used without liability for infringement within the doctrine of fair use will vary in any given case in accordance with the variations in the factors to be considered in applying that doctrine.

■■■ 7. Since a burlesquer must make a sufficient use of the original to recall or conjure up the subject matter being burlesqued, the law permits more extensive use of the protectible portion of a copyrighted work in the creation of a burlesque of that work than in the creation of other fictional or dramatic works not intended as a burlesque of the original. Such right extends to the use by the burlesquer for such purposes of, among other things, an incident or some incidents of the copyrighted story, a developed character, some small and unsubstantial part of the development of the

story, and some small and unsubstantial amount of the dialogue, but not to the use of the general or entire story line and development of the original with its expression, points of suspense and build up to climax. Loew's Incorporated v. Columbia Broadcasting System, Inc., supra.

■■■ 8. In the absence of some attempt to deceive the public as to the origin of a literary work a cause of action will not lie for unfair competition by reason of the use by one writer of a copyrighted literary work created by another. A cause of action for unfair competition may not be established solely by proof that one writer has capitalized on the efforts of another writer. RCA Manufacturing Co. v. Whiteman, 2 Cir., 1940, 114 F.2d 86; Field v. True Comics, Inc., Sup.1949, 89 N.Y.S.2d 35; 2 Nims "Unfair Competition and Trademarks", 1947, at page 900.

■■■ 9. The telecast of the burlesque "From Here To Obscurity" did not infringe the copyright of Columbia in the picture "From Here To Eternity".

■■■ 10. The telecast of the burlesque "From Here To Obscurity" did not constitute any unfair competition to Columbia or to the picture "From Here To Eternity".

11. Defendant is entitled to judgment that plaintiff take nothing by this action.

### Exhibit A

#### Summary of the Motion Picture "From Here To Eternity"

1. *Foundation materials.*

a. *Theme:* The theme of "From Here To Eternity" is the triumph of the American enlisted man's attachment to the life he has chosen, his respect for the Army, and his regard for duty, over personal injustices and personal desires.

b. *Locale:* The locale of the picture is an Army post in Hawaii during the latter part of the year 1941.

c. *Settings:* The scenes include the post administrative offices, grounds, soldiers' quarters, recreation rooms, field maneuver stations, etc., an on-or-near-

post soldiers' hang out, a soldiers' "social club" in Honolulu, and various other Island locations, including the beach, the park, the grounds of the Royal Hawaiian Hotel, etc.

d. *Cast:* Pfc. Robert E. Lee Prewitt, Sgt. Milton Warden, Capt. Dana Holmes, Karen Holmes, Alma Burke, Pfc. Angelo Maggio, Sgts. Judson and Galovitch, and various identified and unidentified soldiers and non-commissioned officers, social club hostesses, etc.

e. *Characterizations:*

· *Prewitt* is in his early 20's. He possesses little or no formal education; is reasonably intelligent but not "clever" or "smart"; talks but little; is inwardly somewhat shy and sensitive. His ideas and principles are wholly uncomplicated, and his outstanding trait is the impregnable stubbornness with which he maintains those simple principles. His stubbornness is without arrogance or defiance; at the same time it increases with pressure and it is not tempered by what is the "practical" or "sensible" way to act. Regardless of any possible past physical experiences, he has an innate shyness with women. He falls in love simply, deeply and uncomplicatedly.

*Warden* is highly intelligent and capable. He has adapted himself superbly to the Army. He knows and likes his job, and he knows that he knows it, including the duty he owes both to the men under him and to those over him. Without losing his basic integrity, he is adaptable—he carries out his Captain's orders and "covers" for him (though he despises the man himself) because that is the Army's traditional practice. As a sergeant he is rough, tough and absolutely fair. He is virile, with a passionate and fierce temper, but with iron self-control. He has known many women, but it is his misfortune to fall in love with one who presents a conflict between his desire and his way of life, and his resolution of the problem is reached only after a hidden but tormented struggle.

*Karen Holmes* is a highly intelligent and naturally warm and passionate woman whose life has become a "gutted

shell", to use her own words. Forced to live with a man she despises—a drunkard, liar and cheat—who has not only destroyed her love, but destroyed her hope of some happiness in the possession of children, she has lost all sense of feeling. Her promiscuity is not the result of desire, but of internal numbness. Suddenly all of her emotions are fired by an intense and overpowering attraction to Warden and the sight of a chance for real happiness.

*Alma Burke (Lorene)* possesses much of Prewitt's simplicity without his single-mindedness or stubbornness. She is a country girl, hurt by the collapse of an adolescent love affair with a snob, who, in typical school-girl fashion, runs away to make her fortune so that she can return and "show them all". In spite of the surroundings the love affair between Prewitt and Alma is a sort of "two-young-things" romance—simple, quiet and tender, even a bit naive—which reflects her own character.

*Holmes* is a man with no redeeming feature, yet he is not an exaggeration or caricature. He is weak, cowardly and mean. He is not physically brutal, but he savours using his position to encourage others to be brutal for him. He knows he is insecure, hence he prostitutes his authority to advance and protect himself.

*Maggio* is light-hearted, volatile, warm, talkative, wise-cracking and above all, care-and consequence-free. At the same time he is intensely loyal to family and friends, and has flashes of hot temper and stubborn courage.

f. *Situations.*

There are three basic situations:

*Situation 1:* A soldier who has been First Bugler of his corps, unjustly loses the position because of favoritism. Impelled by pride and self-respect, he applies for a transfer. An Army captain arranges for the transfer to his company because he wants to use the services of the soldier on the regimental boxing team. The soldier refuses to box because he has theretofore seriously in-

jured a friend in boxing, ruining the friend's career, and never wants to risk a repetition of that tragedy. He is threatened with physical pressure to make him change his mind.

*Situation 2:* The captain is married, but his wife despises him. She has a reputation for promiscuity. The captain's top-sergeant is sexually attracted to the wife.

*Situation 3:* The soldier in Situation 1 meets a girl who has run away from an unhappy love affair and taken a job as a hostess in a soldiers' social club. The soldier and girl are mutually attracted to each other.

2. *The Story:*

The picture opens with the establishment of Situation 1. In a scene in the captain's office, Prewitt tells of the reason why he transferred from the Bugle Corps and why he has determined never to box again. The captain and Warden make it clear that every effort will be made to break his resolution. The second situation is also immediately introduced through scenes showing Karen's unhappy home life and the inception of an "affair" between her and Warden. Additional preliminary scenes develop the "treatment" of physical abuse imposed on Prewitt by the non-coms, Warden's growing respect for Prewitt's strength of character, and the friendship between Prewitt and Maggio.

The third situation is now introduced. Maggio and Prewitt, on week-end leave visit the "New Congress Club" for soldiers. Here Prewitt meets Alma, a "hostess", who has the club name of "Lorene", and is called the "Princess". He is attracted to her and she to him, although her work requires her to be "nice" to others also. In a shy and touching scene in the room of the proprietress, each confides in the other. Alma tells of her past as a waitress, victim of an unhappy love affair with a snob, and her acceptance of her present job in order to make money. Prewitt tells her of the tragedy of blinding his friend, as a result of which he "don't even want to think about boxing". Obviously they are mutually drawn together in a wholesome, innocent way.

As these scenes develop Situation 3, Situation 2 is advanced by a passionately intense scene between Karen and Warden. They meet in a park, and after a near quarrel indicating their explosive natures, they go to a secluded beach to swim. Mutual and passionate sexual desire is clearly though not distastefully made evident. But Warden cannot forget what he has heard about Karen's promiscuity, and he finally accuses her of affairs in general and one in particular. She is incensed enough to admit the accusation and then tells Warden of her background, of her husband's drunken neglect resulting in the loss of her child and her inability to bear other children. Her story transforms Warden with both love and rage, and he realizes, as does she, that they are bound to each other.

The story returns to the Army post. There is a scene showing the pleasant fellowship of the private soldiers, including Prewitt. He "likes this outfit" in spite of his treatment. This is contrasted, by a flash-over, by a scene in which the cowardly Holmes angrily orders his non-coms to force Prewitt to box. The results of those orders are depicted in additional mistreatment of Prewitt. He is finally goaded into refusing to obey an unfair order. For this "insubordination" Holmes not only subjects Prewitt to torturing physical discipline, but also proposes a court martial. Warden, however, by cleverly appealing to Holmes' weaknesses, forestalls this move. Warden is completely fed up with Holmes' cowardice and weak cruelty, and his respect and regard for Prewitt is growing rapidly.

In an on-post beer hall, Maggio gets into a fight with Fatso Judson, a sadistic sergeant, because of a lewd remark made by the latter about Maggio's sister. Warden prevents Maggio's death at Judson's knife-point by standing off the brutal non-com with a broken bottle. This cements the growing friendship between Warden and Prewitt and the former gets

a long-delayed off-post pass for the bugler.

When Prewitt gets to the New Congress Club, he finds that Alma is busy and will not leave her work. In the midst of the quarrel she too realizes that she really loves Prewitt and makes a date for later. Again there is a tender love scene at the cheap bar selected as a rendevous, in which Prewitt confesses his love for the Army and expresses shyly his deep pride at being once selected to play taps at an Armistice Day celebration at Arlington.

The scene is interrupted by the arrival of Maggio, very drunk and AWOL. Apprised of Maggio's walking off guard, Prewitt tries to get him back safely to the post, but on the way Maggio is caught by the MP's. Court martialed, he is sentenced to six months in the stockade. The sergeant-of-the-guard at the stockade is Fatso Judson.

Several scenes show the development of the Warden-Karen situation. Both realize secrecy cannot be maintained much longer. Karen suggests the way out—Warden must take officer's training, so she can divorce Holmes and marry him. Warden hates the thought, but finally promises.

The progress of the Prewitt-Alma situation is simultaneously developed. Prewitt is at Alma's rented house. He wants to marry her—he is even willing to box to get his stripes and a new home for them. Alma, however, demurs. She has her own plans—to make and save money, to go home, and live a proper life with a proper husband and children.

At the post, Prewitt learns that Maggio is being physically tortured in the stockade. His fury is almost uncontrollable. It is this moment that Sergeant Galovitch, a stooge for Holmes, takes to goad Prewitt further for his refusal to box, calling him a coward and finally stomping on his hand. Prewitt's restraint breaks wide open, and a fight results between Galovitch, the heavy slugging puncher, and Prewitt, the clever boxer. Prewitt is initially outclassed be-cause he will not strike at Galovitch's head, remembering his injured friend.

Capt. Holmes is told of the affair and, believing that Galovitch is winning, he declines to stop the fight as Warden desires. At the same time, however, the non-coms who have given Prewitt the "treatment" on Holmes' orders (and who have had a hard time stomaching it) begin to realize that Prewitt is a real soldier and man. Galovitch commits an ugly foul and Prewitt is angered into striking for Galovitch's head. The tide of battle changes, and he is proceeding to beat his opponent badly when, now that his man is hurt, Holmes steps in to stop it and put the blame on Prewitt. But even the boxing non-coms refuse to back Holmes up, and he is forced to pass the matter off. Unknown to him, however, his whole cowardly performance has been watched by his superiors. As the crowd disperses, Prewitt belligerently tells the non-coms that this does not mean he will box. They are nevertheless relaxed and friendly. The "treatment" is obviously ended with Prewitt's victory.

The tempo of the story now speeds up as all the threads are gathered together. Warden gets riotously drunk and "fraternizes" with Prewitt in similar condition, each telling of their "girls". The good natured, slightly sentimental humor of this scene is rudely interrupted as Maggio stumbles in. He has escaped from the stockade, but only after Fatso's cruelty has left him in a dying condition, and he dies in Prewitt's arms. In a scene without words but picturing poignantly the deep feeling of the various men, Prewitt blows taps for his friend. Then he searches for Judson. They fight a duel with knives in which Judson is killed and Prewitt himself is badly wounded. He crawls to Alma's house.

At the post Prewitt is reported absent to Warden, but Warden, guessing that Prewitt has killed Judson, covers for him. Meanwhile the top brass are ready to court martial Holmes for his indefensible cruelty to Prewitt. Cringingly, he tries to avoid the court martial and is

contemptuously permitted to resign for the good of the service.

· Karen rushes to see Warden. Holmes has insisted that she return to the States with him. Warden confesses to her that he has not applied for a commission—he is no officer, but an enlisted man and cannot be anything else. Regardless of his deep love for her, he cannot (no more than Prewitt) do what his principles will not permit.

The climax of the picture comes with the sneak Japanese attack on Pearl Harbor. Warden is in the center of things, almost in command. As the attack passes, there remains War. The whole post atmosphere changes. At Alma's house, Prewitt, groggy with hangover and delirium, hears the announcement of the attack. He feels he must get back at once to his Company, regardless of what happens to him for Judson's death, regardless of his wounds, and regardless of Alma's pleas, even of her offer to marry him. Badly hurt, he struggles back towards the post, directly through the tight, nervous security cordon now established. Tragedy occurs—he is seen, trapped and shot dead by his own Army mates.

The picture closes with two epitaphs. The first is by Warden who identifies the body. Keeping tight rein on his emotion, he says to the officer in charge, "He was always a hardhead, sir. But he was a good soljer. He loved the Army moren any soljer I ever knew". The second comes in the closing scene which brings Alma and Karen together on the boat leaving Honolulu. There Alma tells of her "fiancee", a heroic bomber pilot killed in the December 7 attack. She gives his name as Robert E. Lee Prewitt.

Exhibit B

Summary of Burlesque Television
Program "From Here To
Obscurity"

The playlet opens with a simulated news announcement of the premiere of a new Hollywood movie called "From Here To Obscurity". There follows some comic sub-titles and a card announcing the locale as "Hawaii".

The first scene is in an Army orderly room with "Frankie", an emaciated little soldier, mopping the floor, and the "Sergeant" talking on the phone, apparently to the Captain. The Sergeant is obsequiously promising not to lose the regimental boxing matches again. The conversation ended to his obvious relief, he grumbles about the lack of boxing material, this being emphasized by pointing out that the underfed Frankie is the Company heavyweight. However, the Sergeant is having transferred to his Company the greatest boxer in the world. Frankie says that he knows the transferee will refuse to box; that all he wants to do is to bugle. The Sergeant declares emphatically that in this outfit the new man is going to be a boxer or else.

To the sound of a bugling fanfare, Sid Caesar, as "Montgomery Bugle", enters, playing "You Made Me Love You" on his bugle. There is some slapstick comedy revolving around Bugle's attempt to remember his serial number, and the Sergeant then informs him that he can put the bugle away as he has been transferred in order to box. Bugle declares that he did not join the Army to fight, but to bugle, and again plays "You Made Me Love You." The Sergeant angrily seizes the bugle and bends it completely out of shape, throwing it on the floor. Bugle sadly picks it up and finds it plays as well as ever.

The Sergeant having left, Frankie tells Bugle that unless he boxes he will get "The Treatment". Bugle declares he will not box because "A man is a person, and a person has dignity, and a man's got to have dignity in his heart. Then he'll have dignity, confidence and respect in my bugle". He also tells Frankie the reason for his refusal to fight. It seems that he was once matched with his best buddy, who was also his brother; that in the heat of the fight he hit his brother in the eye and the eyeball was so hard it broke his hand so he couldn't hold the bugle.

The Sergeant returns and upon further refusal of Bugle to box, prefaced by the same speech about "dignity" the Sergeant dramatically declares he will inflict "The Treatment". This consists of pinning Bugle's good conduct medal through his shirt and into his chest, choking him with his own necktie and stomping on his foot. All this is accompanied by comic reactions on the part of Bugle. The Sergeant then leaves and Bugle and Frankie plan to go to town after Bugle puts mercurochrome on his chest to keep himself from becoming infected.

The second scene is in the Paradise Club, which is a dancehall. Before each dance the soldiers must present their dance tickets. Bugle enters playing his favorite popular song on the bugle. A dancehall hostess, the "Duchess" (Imogene Coca), dances with the Sergeant. The Sergeant tells the Duchess that he loves her. She declares she is all his, but when Bugle plays a soft tune she immediately goes over to him and tells him that she now loves him. He suggests a dance to which she agrees, provided he has a ticket. "No ticket—no dance". Each declare their undying love for the other, but they are interrupted briefly by another soldier who kisses the Duchess and freely makes a date with her, after which the Duchess and Bugle return forthwith to their love making, which is by now so violent that the bugle is smashed in the process. However it still plays as well as ever. They agree to meet at the beach for a swim.

The third scene takes place in front of a crude backdrop simulating the beach. Bugle and the Duchess enter, Bugle wearing bathing trunks and a tremendous truck tube life preserver. They sit together on the sand exchanging high flown romanticisms with reference to the beauties of nature, "knights in shining armor", "romantic castles", etc. The entire scene is punctuated from time to time by pails of water obviously thrown from off-stage which douse the participants. Finally Bugle musters up enough courage to "pop the question", which is, "Did you bring a towel?"

The last scene is again in the dancehall. Frankie is taunting the Sergeant with the fact that Bugle has made off with his girl. The Sergeant threatens to kill Bugle, who hears this remark as he and the Duchess return. The Sergeant breaks a bottle and assumes a threatening attitude. Bugle dramatically seizes another bottle with which to arm himself but his efforts and those of the Duchess combined are not sufficient to break it. The Sergeant draws a gun. Bugle seizes it and in the struggle the barrel is bent back double. Gaining possession of the gun, Bugle shoots at the Sergeant, and of course the bullet reverses direction and enters his own chest, to his great surprise. He proceeds to "die" in a flurry of mock-heroics and the skit ends as the Duchess drops a lei on Bugle's chest and, remarking, "He was a funny one", blows taps on the bugle.